Carol SEVERANCE, Petitioner,

v.

Jerry PATTERSON, Commissioner of the Texas General Land Office; Greg Abbott, Attorney General for the State of Texas; and Kurt Sistrunk, District Attorney for the County of Galveston, Texas, Respondents.

No. 09–0387.

Supreme Court of Texas.

Argued Nov. 19, 2009.

Reargued April 19, 2011.

Decided March 30, 2012.

J. David Breemer, Martha Hardwick Hofmeister, Shackelford, Melton & McKinley, L.L.P., Dallas, for Petitioner.

Attorney General Greg W. Abbott, Attorney General of Texas, Kent C. Sullivan, Jeffrey L. Rose, Austin, Rafael Edward Cruz, Houston, Karen Watson Kornell, Daniel L. Geyser, Ken Cross, Gibson Dunn & Crutcher LLP, Dallas, Brian E. Berwick, Office of the Attorney General, Austin, Clarence Andrew Weber, Kelly Hart & Hallman LLP, David S. Morales, Office of the Attorney General, Austin, James C. Ho, Gibson Dunn & Crutcher LLP, Dallas, Daniel T. Hodge, First Assistant Attorney General, William J. "Bill" Cobb III, David C. Mattax, Director of Defense Litigation, Jonathan F. Mitchell, Solicitor General, Office of the Attorney General, Austin, Arthur Cleveland D'Andrea, Assistant Solicitor General, for Respondents.

Justice WAINWRIGHT delivered the opinion of the Court, in which Justice HECHT, Justice GREEN, Justice JOHNSON and Justice WILLETT joined.

After issuing an opinion in this certified question proceeding, we granted respondents' motion for rehearing and heard reargument of the case. Petitioner sold the real property at issue and we abated our proceeding to allow the certifying court, the United States Court of Appeals for the Fifth Circuit, to consider respondents' motion to dismiss the case as moot. *Severance v. Patterson*, 345 S.W.3d 49 (Tex.2011). The Fifth Circuit denied the motion by order dated September 28, 2011, and we reinstated our rehearing of the certified questions. We withdraw our opinion of November 5, 2010, and substitute the following in its place.[1]

Pursuant to article V, section 3–c of the Texas Constitution and Texas Rule of Appellate Procedure 58.1, we accepted the petition from the United States Court of Appeals for the Fifth Circuit to answer the following certified questions:

1. Prior to issuance of our original opinion, we received amicus briefs from Professor Matthew Festa of the South Texas College of Law; the Galveston Chamber of Commerce; the Surfrider Foundation; Surfside Property Owners; the Texas Chapter of American Shore and Beach Preservation Association; the Texas Conference of Urban Counties; the Texas Landowners Counsel; and the Texas Wildlife Association. On rehearing, we received amicus briefs from Blackburn & Carter, P.C.; Joyce Bowman; Brazoria County; Barbara Clark; Evelyn Clark; Luis Decker; Dewey A. Doga; the Economic Development Alliance for Brazoria County; the City of Galveston; Galveston Chamber of Commerce; the Park Board of Trustees of the City of Galveston; J.D. Gregory; Harris County; Harris County Attorney's Office, Harris County Commissioners Court, and the Texas Conference of Urban Counties (collectively); the City of Houston; the Houston Air Alliance; the Port of Houston Authority; Patricia Janki,

M.D.; Steve and Carol Jones; Kendall County and County Attorney Donald W. Allee; Marie B. McDonald; Richard McLaughlin, Endowed Chair for Marine Policy and Law at the Harte Research Institute for Gulf of Mexico Studies at Texas A & M University—Corpus Christi, and Frederick J. McCutchon, Wood Boykin & Wolter PC; Jerry Patterson, Commissioner of the Texas General Land Office (individually); Sonya Porretto; Brooks Porter; State Representative Richard Peña Raymond; Michael R. Riley; D. Ruth Rumsey; Travis W. Rutledge et al.; Save our Beach Association and Friends of Surfside; A.R. "Babe" Schwartz; Charlotte Stirling; the Surfrider Foundation; the Village of Surfside Beach; the Texas Chapter of the American Shore and Beach Preservation Association; the Texas Public Policy Foundation; David Todd; Travis County; and We Texans and Texas United for Reform and Freedom (jointly).

1. Does Texas recognize a "rolling" public beachfront access easement, *i.e.*, an easement in favor of the public that allows access to and use of the beaches on the Gulf of Mexico, the boundary of which easement migrates solely according to naturally caused changes in the location of the vegetation line, without proof of prescription, dedication or customary rights in the property so occupied?

2. If Texas recognizes such an easement, is it derived from common law doctrines or from a construction of the [Open Beaches Act]?

3. To what extent, if any, would a landowner be entitled to receive compensation (other than the amount already offered for removal of the houses) under Texas's law or Constitution for the limitations on use of her property effected by the landward migration of a rolling easement onto property on which no public easement has been found by dedication, prescription, or custom?

*Severance v. Patterson*, 566 F.3d 490, 503–04 (5th Cir.2009), *certified questions accepted*, 52 Tex.Sup.Ct.J. 741 (May 15, 2009). The central issue in this case is one of first impression for this Court: whether private beachfront properties on Galveston Island's West Beach are impressed with a right of public use under Texas law without proof of an easement.

Oceanfront beaches change every day. Over time and sometimes rather suddenly, they shrink or grow, and the tide and vegetation lines may also shift. Beachfront property lines retract or extend as previously dry lands become submerged or submerged lands become dry. According-

ly, public easements that burden these properties along the sea are also dynamic. They may shrink or expand gradually with the properties they encumber. Once established, we do not require the State to re-establish easements each time boundaries move due to gradual and imperceptible changes to the coastal landscape. However, when a beachfront vegetation line is suddenly and dramatically pushed landward by acts of nature, an existing public easement on the public beach does not "roll" inland to other parts of the parcel or onto a new parcel of land. Instead, when land and the attached easement are swallowed by the Gulf of Mexico in an avulsive event, a new easement must be established by sufficient proof to encumber the newly created dry beach bordering the ocean. These public easements may gradually change size and shape as the respective Gulf-front properties they burden imperceptibly change, but they do not "roll" onto previously unencumbered private beachfront parcels or onto new portions of previously encumbered private beachfront parcels when avulsive events cause dramatic changes in the coastline.[2]

We have carefully considered the state officials' arguments on rehearing. The State argues that the answer to the first question is "yes." In other words, the State claims that it is entitled to an easement on privately owned beachfront property without meeting the law's requirements for establishing an easement—a dedication, prescription, or custom. Under the common law, the State's right to submerged land, including the wet beach, is firmly established, regardless of the water's incursion onto previously dry land. In contrast, the State has provided no

**2.** Distinctions in legal consequences between gradual erosive versus dramatic avulsive changes in waterfront property have been recognized in Texas common law for over a

century and by the English common law for at least two and a half centuries. *See* Part III.A., 370 S.W.3d at 721, *infra.*

indication that the common law has given the State an easement that rolls or springs onto property never previously encumbered. There are policies that favor and disfavor the right the State claims, but the right cannot be found in the law. The law allows the State to prove an easement as would anyone else.

## I. Introduction

As we acknowledge continuous and natural physical changes in the West Galveston shoreline, we must also recognize ages-old private property rights that are protected by law. Private property ownership pre-existed the Republic of Texas and the constitutions of both the United States and Texas.[3] *See Eggemeyer v. Eggemeyer*, 554 S.W.2d 137, 140 (Tex.1977) (citing *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922)); *In re Knott*, 118 S.W.3d 899, 902 (Tex.App.-Texarkana 2003, no pet.). Both constitutions protect these rights in private property as essential and fundamental rights of the individual in a free society.

■ Private property rights have been described "as fundamental, natural, inher-

ent, inalienable, not derived from the legislature and as pre-existing even constitutions." *Eggemeyer*, 554 S.W.2d at 140.[4] These constitutional protections underlie our analysis in this proceeding. The question to the Court is to define the scope of the property rights at issue.

■ Generally, an owner of realty has the right to exclude all others from use of the property, one of the "most essential sticks in the bundle of rights that are commonly characterized as property." *Dolan v. City of Tigard*, 512 U.S. 374, 384, 393, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994); *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435–36, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982) (characterizing the right to exclude as "one of the most treasured strands in an owner's bundle of property rights" and observing that "an owner suffers a special kind of injury when a *stranger* directly invades and occupies the owner's property"); *U.S. v. General Motors Corp.*, 323 U.S. 373, 378, 65 S.Ct. 357, 89 L.Ed. 311 (1945) ("property" denotes the group of rights "to possess, use and dispose of it"); *Town of Flower Mound v. Stafford Estates Ltd. P'ship*, 135

**3.** The Bill of Rights, including the Fifth Amendment protection of property rights, was not part of the original Constitution ratified in 1788. After an outcry that the Constitution did not protect the rights of individuals vis-a-vis the government, twelve amendments to the Constitution were proposed to the people for ratification, and ten were ratified. *Bute v. Illinois*, 333 U.S. 640, 651, 68 S.Ct. 763, 92 L.Ed. 986 (1948); ROBERT J. ALLISON, AMERICAN ERAS: DEVELOPMENT OF A NATION (1783–1815) 208 (1997). They became know as the Bill of Rights.

**4.** Private property rights are considered fundamental rights under the Constitution. *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 638, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943) (describing "one's right to life, liberty, and property" as "fundamental rights"); *In re Kemmler*, 136 U.S. 436, 448, 10 S.Ct. 930, 34 L.Ed. 519 (1890) ("Protection to life, liberty,

and property rests primarily, with the states, and the [14th] amendment furnishes an additional guaranty against any encroachment by the states upon those fundamental rights which belong to citizenship...."); *Kelo v. City of New London*, 545 U.S. 469, 510–11, 125 S.Ct. 2655, 162 L.Ed.2d 439 (2005) (Thomas, J., dissenting) ("The Public Use Clause, in short, embodied the Framer's understanding that property is a natural, fundamental right...."); *see* James Madison, *Property*, 27 Mar. 1792, *reprinted in* 14 THE PAPERS OF JAMES MADISON 266 (Robert A. Rutland et al., eds., 1983) ("Government is instituted to protect property of every sort; as well that which lies in the various rights of individuals, as that which the term particularly expresses. This being the end of government, that alone is a *just* government, which *impartially* secures to every man, whatever is his *own*.").

S.W.3d 620, 634 (Tex.2004); *Marcus Cable Assoc., L.P. v. Krohn,* 90 S.W.3d 697, 700 (Tex.2002). Limitations on property rights may be by consent of the owner, state condemnation with payment of just compensation, appropriate government action under its police power (such as addressing nuisances), sufficient proof of use by persons other than the owner that creates an estoppel-based right to continuing use (easements) or pre-existing limitations in the rights of real property owners that have existed "since time immemorial," in the words of the Texas Open Beaches Act (OBA).[5] Tex. Nat. Res.Code §§ 61.001(8). The State of Texas takes the position that owners of private property adjacent to the beach in West Galveston Island have never had the right to exclude the public from their property in the dry beach. Because there is no such limitation established in the property owner's deed to the property at issue, or agreed to by the owner, and the State has not attempted to prove an easement on the property, this legal position raises the question of whether limitations on real property rights on the western portion of Galveston Island existed since time immemorial, as required by the OBA.

Legal encumbrances or reservations on private property rights on the West Beach of Galveston Island dating from original land grants during the Republic of Texas or at the inception of the State of Texas could provide a basis for recognizing public easements on privately owned portions of these beaches or rolling public easements. Prior to 1836, Mexican law precluded colonization of Galveston's beachfront lands for national defense and commercial purposes without approval of the "federal Supreme Executive Power" of Mexico, presumably the Mexican President. However, in 1840 the Republic of Texas, as later confirmed by the State of Texas, granted private title to West Galveston Island without reservation by the State of either title to beachfront property or any public right to use the privately owned beaches. Public rights to use of privately owned property on West Beach in Galveston Island, if such rights existed at that time, were extinguished in the land patents by the Republic of Texas to private parties. In some states, background principles of property law governing oceanfront property provide a basis for public ownership or use of the beachfront property. Such principles are not extant in the origins of Texas. Indeed, the original, unrestricted transfer by the Republic to private parties leaves little occasion for the argument that background principles in Texas common law at the inception of this jurisdiction provide a basis for impressing the West Beach area with a public easement, absent appropriate proof.

The OBA provides the State with a means of enforcing public rights to use of State-owned beaches along the Gulf of

**5.** In *Lucas v. South Carolina Coastal Council,* the Supreme Court noted that pre-existing restrictions in the "background principles of the [s]tate's law" of property could limit the rights of property owners. 505 U.S. 1003, 1029, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992). However, merely pronouncing such a limitation on property rights, whether by judicial decree or executive fiat, would raise serious, constitutional concerns. *See Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot.,* —— U.S. ——, 130 S.Ct. 2592, 177 L.Ed.2d 184 (2010); *Lucas,* 505 U.S. at 1029, 112 S.Ct. 2886. The OBA's reference to "time immemorial" and the Supreme Court's reference to "background principles of [a] [s]tate's law" seem to connote a similar concept. In Texas, non-consensual limitations on property rights not adjudicated and accompanied by due process must have existed since time immemorial to constitute legitimate limitations on the inherent rights of private beachfront property owners.

Mexico and of privately owned beach property along the Gulf of Mexico where an easement is established in favor of the public by prescription or dedication or where a right of public use exists "by virtue of continuous right in the public since time immemorial. . . ." TEX. NAT. RES. CODE §§ 61.011(a), .013(a). Promulgated in 1959, the OBA did not purport to create public easements along Texas's ocean beaches, but recognized that mere pronouncements of encumbrances on private property rights are improper. Because we find no right of public use in historic grants to private owners on West Beach or inherent limitations on their property rights, the State must establish under principles of property law encumbrances on privately owned realty along the West Beach of Galveston Island. For an ease-

ment to roll, there must first be an easement.

## II. Background

In April 2005, Carol Severance purchased three properties on Galveston Island's West Beach. "West Beach" extends from the western edge of Galveston's seawall along the beachfront to the western tip of the island. One of the properties, the Kennedy Drive or Kennedy Beach property, is at issue in this case.[6] A rental home occupies the property. The parties do not dispute that no easement has ever been established on the Kennedy Drive property. A public easement for use of a privately owned parcel seaward of Severance's Kennedy Drive property pre-existed her purchase. That easement was established in a default judgment, dated August 1, 1975,[7] in the case of *John L.*

---

6. Severance owned three properties on West Beach—on Gulf Drive, Kennedy Drive and Bermuda Beach Drive. Her original lawsuit included all three properties, but she only appealed to the Fifth Circuit the district court's judgment dismissing her claims as to two properties. After oral argument to this Court on the certified questions, Severance sold one of two remaining homes at issue in a FEMA-funded buy-out program. Only the Kennedy Drive property remained subject to this litigation at the time we issued the original opinion.

7. Attached to the amicus curiae brief submitted by Kendall County is a partial copy of an agreed judgment signed by the same trial court in the same case a month later, on September 8, 1975. Kendall County argues that the judgment established an easement on Severance's Kennedy Drive property. This argument and the judgment suffer from several deficiencies: 1) The issue was not raised by any party in this litigation in federal or state court. 2) The judgment was agreed to by two defendants and covers nine properties on Galveston's West Beach. It purports, however, to establish an easement along the entire West Beach and bind many landowners who were not parties to the lawsuit. 3) The September 1975 judgment was neither tried to a jury nor a judge but was agreed, as the parties had a

right to do. However, a number of concerns would arise if a couple of property owners were sought out to agree to such an easement on their properties and then attempt to bind the many other property owners along the West Beach. 4) The easement the agreed judgment purports to establish runs from mean low tide to the vegetation line. Physically, such an easement could only encumber those private properties on the front row adjacent to the beach in September 1975. There is no evidence that the property Severance owned on Kennedy Drive was on the front row of West Beach in September 1975. Logic suggests that with a number of hurricanes re-contouring Galveston's beaches since 1975, including Hurricane Rita in 2005, the Kennedy Drive property was not on the front row in 1975. In fact, the court in *Matcha v. Mattox* cites evidence that the Galveston Beach vegetation line was moved landward from 125 to 150 feet by Hurricane Alicia in 1983. 711 S.W.2d 95, 97 (Tex.App.-Austin 1986, writ ref'd n.r.e.). 5) The September 1975 judgment states that Exhibits "B" and "C" attached thereto define the vegetation line along the beach at that time. Neither exhibit was included with the judgment attached to the amicus brief.

*Hill, Attorney General v. West Beach Encroachment, et al.,* Cause No. 108,156 in the 122nd District Court, Galveston County, Texas. Five months after Severance's purchase, Hurricane Rita devastated the adjacent property burdened by an easement and moved the line of vegetation landward. The entirety of the house on Severance's Kennedy Drive property is now seaward of the vegetation line. The State claimed a portion of her property was located on a public beachfront easement and a portion of her house interfered with the public's use of the dry beach. When the State sought to enforce an easement on her private property pursuant to the OBA, Severance sued several state officials in federal district court. She argued that the State, in attempting to enforce a public easement without proving its existence, on property not previously encumbered by an easement, infringed upon her federal constitutional rights and constituted (1) an unreasonable seizure under the Fourth Amendment, (2) an unconstitutional taking under the Fifth and Fourteenth Amendments, and (3) a violation of her substantive due process rights under the Fourteenth Amendment.

The state officials filed motions to dismiss the case on the merits and for lack of jurisdiction. The federal district court dismissed Severance's case after determining her arguments regarding the constitutionality of a rolling easement while "arguably ripe" were deficient on the merits. *Severance v. Patterson,* 485 F.Supp.2d 793, 800, 805 (S.D.Tex.2007). Not presented with the information concerning the Republic's land grant, the court held that an easement on a parcel seaward of Severance's property pre-existed her ownership of the property and that after an easement to private beachfront property had been established between the mean high tide and vegetation lines, it "rolls" onto new parcels of realty according to natural changes to those boundaries. *Id.* at 802–04. Severance only appealed her Fourth and Fifth Amendment challenges to the rolling easement theory. On appeal, the Fifth Circuit determined her Fifth Amendment takings claim was not ripe, but certified unsettled questions of state law to this Court to guide its determination on her Fourth Amendment unreasonable seizure claim. *Severance,* 566 F.3d at 500, 503–04.

We issued an opinion addressing the certified questions on November 5, 2010. *Severance v. Patterson,* 345 S.W.3d 18 (Tex.2010, reh'g granted). On the State's motion, we granted the request for rehearing on March 11, 2011. While rehearing was pending in this Court, Severance sold the remaining property at issue in her suit to the City of Galveston in June 2011 as part of a disaster-assistance program funded by the Federal Emergency Management Agency. *See* 42 U.S.C. § 5170c. The State then requested that we vacate our November 5, 2010 opinion and return the matter to the Fifth Circuit to dismiss as moot. The State also filed a similar motion before that Court. We abated our rehearing on July 29, 2011 to allow the Fifth Circuit to resolve the mootness issue raised by the State. Following briefing by the parties, the Fifth Circuit issued an order dated September 28, 2011 denying the State's request, concluding that the statutory threat of civil penalties imparted continued vitality to Severance's action. After the Fifth Circuit determined that the dispute between the parties continues to present a live controversy, we reinstated, on October 7, 2011, our consideration of the matter on rehearing.

## A. Texas Property Law in Coastal Areas

We have not been asked to determine whether a taking would occur if the

State ordered removal of Severance's house, although constitutional protections of property rights fortify the conclusions we reach. The certified questions require us to address the competing interests between the State's asserted right to a rolling public easement to use privately owned beachfront property on Galveston Island's West Beach and the rights of the private property owner to exclude others from her property. The "law of real property is, under [the federal] Constitution, left to the individual States to develop and administer." *Phillips Petrol. Co. v. Mississippi*, 484 U.S. 469, 484, 108 S.Ct. 791, 98 L.Ed.2d 877 (1988) (quoting *Hughes v. Washington*, 389 U.S. 290, 295, 88 S.Ct. 438, 19 L.Ed.2d 530 (1967) (Stewart, J., concurring)); *Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot.*, — U.S. ——, 130 S.Ct. 2592, 2612, 177 L.Ed.2d 184 (2010) ("The Takings Clause only protects property rights as they are established under state law, not as they might have been established or ought to have been established."); *Oregon ex rel. State Land Bd. v. Corvallis Sand & Gravel Co.*, 429 U.S. 363, 377, 97 S.Ct. 582, 50 L.Ed.2d 550 (1977) (explaining that "subsequent changes in the contour of the land, as well as subsequent transfers of the land, are governed by the state law" (citation omitted)).

Certainly, there is a history in Texas of public use of public Gulf-front beaches, including on Galveston Island's West Beach. On one hand, the public has an important interest in the enjoyment of the public beaches. But on the other hand, the right to exclude others from privately owned realty is among the most valuable and fundamental of rights possessed by private property owners. The boundary distinguishing private property rights is set forth in the definition of public beaches, prudently set forth in the OBA.

### 1. Defining Public Beaches in Texas

The Open Beaches Act states the policy of the State of Texas for enjoyment of public beaches along the Gulf of Mexico. The OBA declares the State's public policy to be "free and unrestricted right of ingress and egress" to State-owned beaches and to private beach property to which the public "has acquired" an easement or other right of use to that property. TEX. NAT. RES.CODE § 61.011(a). It defines "[p]ublic beach[es]" as:

> any beach area, whether publicly or privately owned, extending inland from the line of mean low tide to the line of vegetation bordering on the Gulf of Mexico to which the public has acquired the right of use or easement to or over the area by prescription, dedication, presumption, or has retained a right by virtue of continuous right in the public since time immemorial, as recognized in law and custom. This definition does not include a beach that is not accessible by a public road or public ferry as provided in Section 61.021 of this code.

*Id.* § 61.001(8).[8] Privately owned beaches may be included in the definition of public

---

8. In 2009, Texas voters approved an amendment to the Constitution to protect the public's right to use "public beach[es]" of the Gulf of Mexico. TEX. CONST. art. I, § 33. Public beaches are defined, similar to the OBA, as state-owned beaches and "any larger area" in the wet or dry beach "to which the public has acquired a right of use or easement ... or retained a right by virtue of continuous right." Although not at issue in this case, the amendment provides:

> Section 1. Article I, Texas Constitution, is amended by adding Section 33 to read as follows:
> Sec. 33. (a) In this section, "public beach" means a state-owned beach bordering on the seaward shore of the Gulf of Mexico, extending from mean low tide to

beaches. *Id.* The Legislature defined public beach by two criteria: physical location and right of use. A public beach under the OBA must border the Gulf of Mexico. *Id.* The OBA does not specifically refer to inland bodies of water. Along the Gulf, public beaches are located on the ocean shore from the line of mean low tide to the line of vegetation, subject to the second statutory requirement explained below. *Id.* The area from mean low tide to mean high tide is called the "wet beach," because it is under the tidal waters some time during each day. The area from mean high tide to the vegetation line is known as the "dry beach."

The second requirement for a Gulf-shore beach to fall within the definition of "public beach" is the public must have a right to use the beach. This right may be "acquired" through a "right of use or easement" or it may be "retained" in the public "by virtue of continuous right in the public since time immemorial...." *Id.* The OBA does not create easements for public use along Texas Gulf-front beaches. *Id.* at § 61.011(a); *Seaway Co. v. Att'y Gen.*, 375 S.W.2d 923, 929–30 (Tex.Civ.App.-Houston 1964, writ ref'd n.r.e.).

The wet beaches are all owned by the State of Texas, which leaves no dispute over the public's right of use. *See Luttes v. State*, 159 Tex. 500, 324 S.W.2d 167, 169, 191–92 (1958); Tex. Nat. Res.Code §§ 61.011, .161 (recognizing the public policies of the public's right to use public beaches and the public's right to ingress and egress to the sea); Richard J. Elliott, *The Texas Open Beaches Act: Public Rights to Beach Access*, 28 Baylor L.Rev. 383, 384 (1976) (State-owned beaches are the strips of coastal property "between mean low tide and mean high tide, which runs along the entire Gulf Coast, regardless of whether the property immediately landward is privately or state owned."). However, the dry beach often is privately owned and the right to use it is not presumed under the OBA.[9] The Legislature recognized that the existence of a public right to an easement in the privately owned dry beach area of West Beach is dependent on the government's establish-

---

the landward boundary of state-owned submerged land, and any larger area extending from the line of mean low tide to the line of vegetation bordering on the Gulf of Mexico to which the public has acquired a right of use or easement to or over the area by prescription or dedication or has established and retained a right by virtue of continuous right in the public under Texas common law.

(b) The public, individually and collectively, has an unrestricted right to use and a right of ingress to and egress from a public beach. The right granted by this subsection is dedicated as a permanent easement in favor of the public.

(c) The legislature may enact laws to protect the right of the public to access and use a public beach and to protect the public beach easement from interference and encroachments.

(d) This section does not create a private right of enforcement.

9. The OBA includes two stated presumptions for purposes of ingress and egress to the sea. It provides that the title of private owners of dry beach area in Gulf beaches "does not include the right to prevent the public from using the area for ingress and egress to the sea." Tex. Nat. Res.Code § 61.020(a)(1). In 1991, the OBA was amended to add a second presumption that imposed "on the area a common law right or easement in favor of the public for ingress and egress to the sea." *Id.* § 61.020(a)(2). Although the constitutionality of these presumptions has been questioned, that issue is not before us. *See Seaway Co. v. Att'y Gen.*, 375 S.W.2d 923, 929–30 (Tex.Civ. App.-Houston 1964, writ ref'd n.r.e.); Shannon H. Ratliff, *Shoreline Boundaries, Part I: Legal Principles*, Texas Coastal Law Conference, May 19–20, 2005 20 n. 42 *reprinted in* Plaintiff's Appendix of Record Excerpts and Cited Materials at tab 6, *Severance v. Patterson* (No. 09–0387), 345 S.W.3d 18 (also noting the same constitutional concern).

ing an easement in the dry beach or the public's right to use of the beach "by virtue of continuous right in the public since time immemorial...." TEX. NAT RES.CODE § 61.001(8). Accordingly, where the dry beach is privately owned, it is part of the "public beach" if a right to public use has been established on it. *See id.* Thus, a "public beach" includes but is broader than beaches owned by the State in those instances in which an easement for public use is established in the dry beach area. *Id.* Public beaches include Gulf-front wet beaches, State-owned dry beaches and private property in the dry beaches on which a public easement has been established.

In this case, before Hurricane Rita, Severance's house on the Kennedy Drive property was landward of the vegetation line. After Hurricane Rita, because the storm moved the vegetation and high tide lines landward, the property between Severance's land and the sea, on which a public easement had been established, was submerged in the surf or became part of the wet beach. Severance's Kennedy Drive parcel and her house are no longer behind the vegetation line but neither are they located on the wet beach owned by the State. At least a portion of Severance's Kennedy Drive property and all of her house are now located in the dry beach. The question is, did the easement on the property seaward of Severance's property "roll" onto Severance's property? In other words, because Severance's house is now located in the dry beach, is it thereby subject to an enforcement action to remove it under the OBA? The Fifth Circuit's first question, its threshold inquiry, encompasses both whether an easement can "roll" from a parcel previously encumbered by an easement established by prescription, dedication, or custom to a distinct parcel not so encumbered as well as whether a previously established easement can roll from one portion of a parcel to another part of the same parcel. From the Fifth Circuit's opinion, we understand that no easement has been proven to exist on Severance's property under the OBA or the common law. *See Severance,* 566 F.3d at 494 (noting that no easement had been established on Severance's property by prescription, implied dedication, or continuous right). Severance contends, and it is not disputed, that there are no express limitations or reservations in Severance's title giving rise to a public easement. The answer to the rolling easement question thus turns on whether Texas common law recognizes such an inherent limitation on private property rights along Galveston's West Beach, or whether principles of Texas property law provide for a rolling easement on the beaches along the Gulf Coast.

### 2. History of Beach Ownership Along the Gulf of Mexico

 Long-standing principles of Texas property law establish parameters for our analysis. It is well-established that the "soil covered by the bays, inlets, and arms of the Gulf of Mexico within tidewater limits belongs to the State, and constitutes public property that is held in trust for the use and benefit of all the people." *Lorino v. Crawford Packing Co.,* 142 Tex. 51, 175 S.W.2d 410, 413 (1943); *Landry v. Robison,* 110 Tex. 295, 219 S.W. 819, 820 (1920) ("For our decisions are unanimous in the declaration that by the principles of the civil and common law, soil under navigable waters was treated as held by the state or nation in trust for the whole people."[10]); *De Meritt v. Robison Land*

10. "The bays, inlets, and other waters along the Gulf Coast which are subject to the ebb and flow of the tide of the Gulf of Mexico are defined as 'navigable waters.'" *Lorino,* 175 S.W.2d at 413 (citing *City of Galveston v. Mann,* 135 Tex. 319, 143 S.W.2d 1028, 1033

*Comm'r*, 102 Tex. 358, 116 S.W. 796, 797 (1909) (holding "[i]n the contemplation of law," soil lying below the line of ordinary high tide, "was not land, but water"); *see also* Tex. Nat. Res.Code § 11.012(c) ("The State of Texas owns the water and the beds and shores of the Gulf of Mexico and the arms of the Gulf of Mexico within the boundaries provided in this section, including all land which is covered by the Gulf of Mexico and the arms of the Gulf of Mexico either at low tide or high tide."). These lands are part of the public trust, and only the Legislature can grant to private parties title to submerged lands that are part of the public trust. *Lorino*, 175 S.W.2d at 414; *see also TH Invs., Inc. v. Kirby Inland Marine, L.P.*, 218 S.W.3d 173, 182–83 (Tex.App.-Houston [14th Dist.] 2007, pet. denied) (holding that lands submerged in the Gulf belong to the State) (citations omitted).

Current title to realty and corresponding encumbrances on the property may be affected in important ways by the breadth of and limitations on prior grants and titles. We review the original Mexican and Republic of Texas grants and patents to lands abutting the sea in West Galveston Island.[11] The Republic of Texas won her independence from Mexico in 1836. Mexico's laws prohibited colonization of land within ten leagues of the coast without approval from the president. General Law of Colonization, art. 4 (Mex., Aug. 18, 1824), *reprinted in* 1 H.P.N. Gammel, The Laws of Texas 1822–1897 [hereinafter "Gammel, The Laws of Texas"] 97 (Austin, Gammel Book Co. 1898).[12] At the time that Texas became a republic, privately owned West Galveston lands were subject to significant governmental restrictions.

However, in November 1840, the Republic of Texas granted private title to West Beach property to Levi Jones and Edward Hall in a single patent (the "Jones and Hall Grant"). Jones and Hall Grant Papers, *available at* http://www.glo.texas.gov/cf/land-grant-search/index.cfm (search abstract number 121, Galveston County);[13] *see Seaway*, 375 S.W.2d at 928. After admission to the Union in 1845, the State of Texas by legislation in 1852 and 1854 first confirmed the validity of the Jones and Hall Grant and then disclaimed title to those lands. In 1852, the State declared that it "hereby releases and relinquishes forever, all of her title to such lots on Galveston Island as are now in the actual possession and occupation of persons who purchased under the [Jones and Hall Grant]." Act approved Feb. 16, 1852, 4th Leg., R. S., ch. 119, § 1, 1852 Tex. Gen. Laws 142, *reprinted in* 3 Gammel, The Laws of Texas, at 1020; Act of Feb. 8, 1854, 5th Leg., R. S., ch. 73, § 1, 1854 Tex. Special Laws 125–26, *reprinted in* 4 Gammel, The Laws of Texas, at 125–26 (confirming the 1840 Jones and Hall Grant and "disclaim[ing] any title in and to the lands described in said patent, in favor of the grantees and those claiming under them").[14] In the 1854 Act, the State af-

(1940); *Crary v. Port Arthur Channel & Dock Co.*, 92 Tex. 275, 47 S.W. 967, 970 (1898)).

11. The briefs and the record do not address the effect of the early land grant of Galveston's West Beach.

12. The Mexican federal government "feared that an influx of foreigners along the border of the United States, or along the coast, might become too powerful, and betray the country to a foreign power." Lewis N. Dembitz, A Treatise on Land Titles in the United States § 73, at 558 (1895).

13. All Internet materials as visited March 14, 2012 and available in clerk of Court's file.

14. The Act reads: "Be it enacted by the Legislature of the State of Texas, That the patent issued by the Commissioner of the General Land[ O]ffice, on the twenty-eighth day of November, eighteen hundred and forty, to

firmed its intent to grant ownership of all land in West Beach up to the public trust to Jones and Hall with no express reservation of either title to the property or a public right to use the beaches.[15] The government relinquished all title in the Jones and Hall Grant, without reserving any right to use of the property. The Republic could have reserved the right of the public to use the beachfront property, "but the plain language of the grant shows the Republic of Texas did not do so." *Seaway Co.*, 375 S.W.2d at 929. All the Gulf beachland in West Galveston Island that extended to the public trust was conveyed to private parties by the sovereign

Republic of Texas as later affirmed by the State of Texas.

Having established that the State of Texas owned the land under Gulf tidal waters, the question remained how far inland from the low tide line did the public trust—the State's title—extend. We answered that question in *Luttes v. State.* This Court held that the delineation between State-owned submerged tidal lands (held in trust for the public) and coastal property that could be privately owned was the "mean higher high tide" line under Spanish or Mexican grants and the "mean high tide" line under Anglo–American law.[16] 159 Tex. 500, 324 S.W.2d 167, 191–

---

Levi Jones and Edward Hall, for lands on Galveston Island, be, and the same is hereby confirmed, and the State of Texas disclaims any title in and to the lands described in said patent, in favor of the grantees and those claiming under them." Act of Feb. 8, 1854, 5th Leg., R.S., ch. 73, § 1, 1854 Tex. Special Laws 125–26, *reprinted in* 4 GAMMEL, THE LAWS OF TEXAS, at 125–26.

15. There is some historical evidence that the Republic made an abortive attempt to parcel and sell title to lands on West Galveston Island starting in 1837. *See* Act approved June 12, 1837, 1st Cong., 1 Repub. Tex. Laws 267 (1838), *reprinted in* 1 GAMMEL, THE LAWS OF TEXAS, at 1327, (authorizing sales of title to lots on Galveston Island by auction); Annual Report of the Secretary of the Treasury, Nov. 1839, *reprinted in* 3 HARRIET SMITHER, JOURNALS OF THE FOURTH CONGRESS OF THE REPUBLIC OF TEXAS 1839–1840, at 35, 45 (Austin, Texas State Library 1931) (reporting treasury receipts "on account Sales Galveston Island"). In an 1860 mandamus proceeding, in light of then-lingering questions about the validity of Jones and Hall's title to West Beach, a district court directed the land commissioner to issue a single land patent to Jones and Hall for all of West Beach. *See Franklin v. Kesler*, 25 Tex. 138, 142–43 (1860) (describing the patent issued pursuant to mandamus). The February 15, 1852 act expressly vested title in those claiming successor title under the Jones and Hall Grant, and the February 8, 1854 act confirms the Jones and Hall Grant in its entirety. Further, *Wilcox v. Chambers* con-

firmed that if title of coastal lands were granted to foreigners (non-Mexican individuals) prior to 1840, the grants are presumed void absent specific approval by the Mexican President. 26 Tex. 181, 187 (1862).

Legislation and a patent (the *"Menard Grant"*) conveyed oceanfront property on the east side of Galveston Island to private parties in 1836 and 1838. *City of Galveston v. Menard*, 23 Tex. 349, 391 (1859).

16. Severance's parcel is not subject to Spanish or Mexican law. So, we refer to the mean high tide line throughout this opinion. On January 20, 1840, Texas adopted the common law of England as its rule of decision, to the extent it was not inconsistent with the Constitution of the Republic of Texas or acts of its Congress. Act approved Jan. 20, 1840, 4th Cong., R.S., § 1, 1840 Repub. Tex. Laws 3–4, *reprinted in* 2 GAMMEL, THE LAWS OF TEXAS, at 177–80; *Miller v. Letzerich*, 121 Tex. 248, 49 S.W.2d 404, 408 (1932) (explaining that "the validity and legal effect of contracts and of grants of land made before the adoption of the common law must be determined according to the civil law in effect at the time of the grants"). Because the Jones and Hall Grant was made in November 1840, land granted under that patent is governed by the common law. *See* William Gardner Winters, Jr., *The Shoreline for Spanish and Mexican Grants in Texas*, 38 TEX. L.REV. 523 (1960) (discussing the history of Spanish and Mexican land patents and common law basis for shoreline boundaries).

92 (1958). The wet beach is owned by the State as part of the public trust, and the dry beach is not part of the public trust and may be privately owned. *See generally id.* Prior to *Luttes,* there was a question whether the public trust extended to the vegetation line and included the dry beach. The State argued that it did. *Luttes* rejected that proposition and established the landward boundary of the public trust at the mean high tide line. *Luttes,* 324 S.W.2d at 187.

These boundary demarcations, linked to vegetation, high tide, and low tide lines are a direct response to the ever-changing nature of the coastal landscape because it is impractical to apply static real property boundary concepts to property lines that are delineated by the ocean's edge. The sand does not stay in one place, nor does the tide line. While the vegetation line may appear static because it does not move daily like the tide, it is also constantly affected by the tide, wind, and other forces of nature.

A person purchasing beachfront property along the Texas coast does so with the risk that her property may eventually, or suddenly, recede into the ocean. When beachfront property recedes seaward and becomes part of the wet beach or submerged under the ocean, a private property owner loses that property to the public trust. We explained in *State v. Balli:*

> Any distinction that can be drawn between the alluvion of rivers and accretions cast up by the sea must arise out of the law of the seashore rather than that of accession and be based ... upon the ancient maxim that the seashore is common property and never passes to private hands.... [This] remains as a guiding principle in all or nearly all jurisdictions which acknowledge the common law....

144 Tex. 195, 190 S.W.2d 71, 100 (1945). Likewise, if the ocean naturally and gradually recedes away from the land moving the high tide line seaward, a private property owner's land may increase at the expense of the public trust. *See id.* at 100–01. Regardless of these changes, the boundary remains fixed (relatively) at the mean high tide line. *See Luttes,* 324 S.W.2d at 191–93. Any other approach would leave locating that boundary to pure guesswork. *See Coastal Indus. Water Auth. v. York,* 532 S.W.2d 949, 952 n. 1 (Tex.1976).

In 1959, the Legislature enacted the Open Beaches Act to address responses to the *Luttes* opinion establishing the common law landward boundary of State-owned beaches at the mean high tide line. Because the State could no longer lay claim to the dry beach as part of the public trust, some feared that this holding might " 'give encouragement to some overanxious developers to fence the seashore' " in the dry beach as some private landowners had "erected barricades upon many beaches, some of these barricades extending into the water." TEX. LEGIS. BEACH STUDY COMM., 57TH LEG., R.S., THE BEACHES AND ISLANDS OF TEXAS [hereinafter "BEACH STUDY COMM., BEACHES AND ISLANDS OF TEXAS"] 1 (1961), *available at* http://www.lrl.state.tx.us/scanned/interim/56/56_B352.pdf; TEX. LEG. INTERIM BEACH STUDY COMM., 65TH LEG., R. S., FOOTPRINTS ON THE SANDS OF TIME [hereinafter "BEACH STUDY COMM., FOOTPRINTS"] 22 (1969), *available at* http://www.lrl.state.tx.us/scanned/interim/60/B352.pdf (quoting Richard M. Morehead, *Texas Coast Gets Wave of Attention at Session,* DALLAS MORNING NEWS, May 30, 1959, at 10 (quoting Rep. Bob Eckhardt (Hou.))). The OBA declared the State's public policy for the public to have "free and unrestricted access" to State-owned beaches, the wet beach, and the dry beach if the public had acquired an easement or

other right to use that property. TEX. NAT. RES.CODE § 61.011(a). To enforce this policy, the OBA prohibits anyone from creating, erecting, or constructing any "obstruction, barrier, or restraint that will interfere with the free and unrestricted right of the public" to access Texas beaches where the public has acquired a right of use or easement. *Id.* § 61.013(a). The Act authorizes the removal of barriers or other obstructions on

> state-owned beaches to which the public has the right of ingress and egress bordering on the seaward shore of the Gulf of Mexico or any larger area extending from the line of mean low tide to the line of vegetation bordering on the Gulf of Mexico *if the public has acquired a right of use or easement* to or over the area by prescription, dedication, or has *retained a right by virtue of continuous right in the public.*

*Id.* §§ 61.012, .013(a) (emphasis added).

The OBA does not alter *Luttes.* It enforces the public's right to use the dry beach on private property where an easement exists and enforces public rights to use State-owned beaches. Therefore, the OBA, by its terms, does not create or diminish substantive property rights. The statute cannot truly be said to create any new rights. *See* BEACH STUDY COMM., FOOTPRINTS 17 (noting that the OBA "does not and can not, declare that the public has an easement to the beach, a right of access over private property to and from the State-owned beaches bordering on the Gulf of Mexico"); Elliott, 28 BAYLOR L.REV. at 392 ("In terms of pure substantive law, the Open Beaches Act probably creates no rights in the public which did not previously exist under the common law."). In promulgating the OBA, the Legislature seemed careful to preserve private property rights by emphasizing that the enforcement of public use of private beachfront property can occur when a historic right of use is retained in the public or is proven by dedication or prescription. *See* TEX. NAT. RES.CODE § 61.013(a), (c). The OBA also specifically disclaims any intent to take rights from private owners of Gulfshore beach property. *Id.* § 61.023 (noting that "[t]he provisions of this subchapter shall not be construed as affecting in any way the title of the owners of land adjacent to any state-owned beach bordering on the seaward shore of the Gulf of Mexico ...."); *see Seaway Co.,* 375 S.W.2d at 930 ("There is nothing in the Act which seeks to take rights from an owner of land."). Within these acknowledgments, the OBA proclaims that beaches should be open to the public. Certainly, the OBA guards the right of the public to use public beaches against infringement by private interests. But, as explained, the OBA is not contrary to private property rights at issue in this case under principles of Texas law. The public has a right to use the West Galveston beaches when the State owns the beaches or the government obtains or proves an easement for use of the dry beach under the common law or by other means set forth in the OBA.[17]

In 1969, the Legislature's Interim Beach Study Committee, chaired by Senator A.R.

---

**17.** In 1961, the Texas Legislative Beach Study Committee further evidenced its recognition that private property rights exist in the dry beaches by proposing to the 57th Legislature that it come up with practical methods for not only procuring easements for ingress and egress to beaches but also methods of "negotiations with landowners for additional easements" for the "use and pleasure of the public, provided such lands or easements can be obtained without cost to the State." BEACH STUDY COMM., BEACHES AND ISLANDS OF TEXAS xi. If Gulf-front dry beach property were State-owned or already impressed with an easement for public use, negotiations to obtain them would not be necessary.

"Babe" Schwartz of Galveston County, confirmed that:

> [The OBA] does not, and can not, declare that the public has an easement on the beach, a right of access over private property to and from the State-owned beaches bordering on the Gulf of Mexico. *An easement is a property interest; the State can no more impress private property with an easement without compensating the owner of the property than it can build a highway across such land without paying the owner.*

BEACH STUDY COMM., FOOTPRINTS 17 (emphasis added). The Legislature created the Interim Beach Study Committee, among other reasons, to assure that beach development be undertaken to serve the best interests of the people of Texas and to study methods of procuring right-of-ways for roads parallel to the beaches, easements for ingress and egress to the beach, parking for beach access, methods for negotiating with landowners for additional easements, and rights for landowners to construct works for the protection of their property. *Id.* at 1–2.

### B. Background on Severance's Property

Carol Severance purchased the Kennedy Drive property on Galveston Island's West Beach in 2005. The Fifth Circuit explained that "[n]o easement has ever been established on [her] parcel via prescription, implied dedication, or continuous right." 566 F.3d at 494.[18] The State obtained the *Hill* judgment in August 1975 that encumbered a strip of beach seaward of Severance's property. Severance's Kennedy Drive parcel was not included in the 1975 judgment. However, the parties dispute whether or not Severance's parcel is subject to a rolling easement.

In 1999, the Kennedy Drive house was on a Texas General Land Office (GLO) list of approximately 107 Texas homes located seaward of the vegetation line after Tropical Storm Frances hit the island in 1998. In 2004, the GLO again determined that the Kennedy Drive home was located "wholly or in part" on the dry beach in 2004, but did not threaten public health or safety and, at the time, was subject to a GLO two-year moratorium order. When Severance purchased the property, she received an OBA-mandated disclosure explaining that the property may become located on a public beach due to natural processes such as shoreline erosion, and if that happened, the State could sue, seeking to forcibly remove any structures that come to be located on the public beach. *See* TEX. NAT. RES.CODE § 61.025. Winds attributed to Hurricane Rita shifted the vegetation line further inland in September 2005. In 2006, the GLO determined that Severance's house was entirely within the dry beach.

The moratorium for enforcing the OBA on Severance's properties expired on June 7, 2006. Severance received a letter from the GLO requiring her to remove the Kennedy Drive home because it was located on a public beach. A second letter reiterated that the home was in violation of the OBA and must be removed from the beach, and offered her $40,000 to remove or relocate

---

18. The district court opinion mentions in a parenthetical phrase that Severance admitted that an easement existed on her properties when she purchased them. On rehearing at the district court, Severance objected to the statement. The Fifth Circuit, as quoted, appears to disagree with it. The State has not asserted either that an easement existed on Severance's Kennedy Drive property when she purchased it or that she admitted to its existence, but the State does contend that, essentially, a virtual easement always exists on private property in the dry beach by virtue of the "rolling easement" theory. *See* JUSTICE MEDINA's dissent, 370 S.W.3d at 735; JUSTICE LEHRMANN's dissent, 370 S.W.3d at 752.

it if she acted before October 2006. She initiated suit in federal court. The Fifth Circuit certified questions of Texas law to this Court.

## III. Public Beachfront Easements

The first certified question asks if Texas recognizes "a 'rolling' public beachfront access easement, *i.e.*, an easement in favor of the public that allows access to and use of the beaches on the Gulf of Mexico, the boundary of which easement migrates solely according to naturally caused changes in the location of the vegetation line, without proof of prescription, dedication, or customary rights in the property so occupied?" 566 F.3d at 504. We have never held that the State has a right in privately owned beachfront property for public use that exists without proof of the normal means of creating an easement. And there is no support presented for the proposition that, during the time of the Republic of Texas or at the inception of our State, the State reserved the oceanfront for public use. In fact, as discussed above, the Texas Legislature expressly disclaimed any interest in title obtained from the Jones and Hall Grant after our State was admitted to the Union. *See* Part II.A.2, *supra; see also Seaway Co.,* 375 S.W.2d at 928 ("On November 28, 1840, the Republic of Texas issued its patent to Levi Jones and Edward Hall to 18,215 acres of land on Galveston Island. This grant covered all of Galveston Island except the land covered by the *Menard* Grant covering the east portion of the Island.").[19] Therefore, considering the absence of any historic custom or inherent title limitations for public use on private West Beach property, principles of property law answer the first certified question.

## A. Dynamic Nature of Beachfront Easements

 Easements exist for the benefit of the easement holder for a specific purpose. An easement does not divest a property owner of title, but allows another to use the property for that purpose. *See Marcus Cable Assocs., L.P. v. Krohn,* 90 S.W.3d 697, 700 (Tex.2002) (explaining that an easement relinquishes a property owner's right to exclude someone from their property for a particular purpose) (citations omitted). The existence of an easement "in general terms implies a grant of unlimited reasonable use such as is reasonably necessary and convenient and as little burdensome as possible to the servient owner." *Coleman v. Forister,* 514 S.W.2d 899, 903 (Tex.1974). An easement appurtenant "defines the relationship of two pieces of land"—a dominant and a servient estate. *See* 7 Thompson On Real Property § 60.02(f)(1), at 469 (David A. Thomas, ed.2006). Because the easement holder is the dominant estate owner and the land burdened by the easement is the servient estate, the property owner may not interfere with the easement holder's right to use the servient estate for the purposes of the easement. *Drye v. Eagle Rock Ranch, Inc.,* 364 S.W.2d 196, 207 (Tex.1963) (citation omitted); *Vrazel v. Skrabanek,* 725 S.W.2d 709, 711 (Tex.1987).

 Easement boundaries are generally static and attached to a specific portion of private property. *See Holmstrom v. Lee,* 26 S.W.3d 526, 533 (Tex.App.-Austin 2000, no pet.) ("Once established, the location or character of the easement cannot be changed without the consent of the parties."); *see also* 7 Thompson on Real Property § 60.04(c)(1)(ii), at 538–40. "As

19. The State argues that four courts of appeals opinions establish legal limitations dating back to "time immemorial" on private title to West Galveston property. *See* Tex Nat. Res.Code § 61.001(8). These opinions are discussed further at Part III.C, *infra.*

a general rule, once the location of an easement has been established, neither the servient estate owner nor the easement holder may unilaterally relocate the servitude." JON W. BRUCE & JAMES W. ELY, JR., THE LAW OF EASEMENTS AND LICENSES IN LAND § 7:13, at 7–30 (2009). Therefore, a new easement must be re-established for it to encumber a part of the parcel not previously encumbered. *See id.*

Like easements, real property boundaries are generally static as well. But property boundaries established by bodies of water are necessarily dynamic. Because those boundaries are dynamic due to natural forces that affect the shoreline or banks, the legal rules developed for static boundaries are somewhat different. *See York,* 532 S.W.2d at 952 (discussing erosion, accretion, and avulsion doctrines affecting property boundaries and riparian ownership in the Houston Ship Channel).

The nature of littoral property boundaries abutting the ocean not only incorporates the daily ebbs and flows of the tide, but also more permanent changes to the coastal landscape due to weather and other natural forces.

▮▮▮ Courts generally adhere to the principle "that a riparian or littoral owner acquires or loses title to the land gradually or imperceptibly" added to or taken away from their banks or shores through erosion, the wearing away of land, and accretion, the enlargement of the land. *Id.* at 952. "Riparian" means "[o]f, relating to, or located on the bank of a river or stream (or occasionally another body of water,

such as a lake)." BLACK'S LAW DICTIONARY 1352 (8th ed.2004). "Littoral" means "[o]f or relating to the coast or shore of an ocean, sea, or lake . . . ." *Id.* at 952. "Accretion" is the process of "gradual enlargement" of riparian or littoral land. *York,* 532 S.W.2d at 952. Closely related, "erosion" is "the gradual wearing away of the land." *Brainard v. State,* 12 S.W.3d 6, 10 n. 1 (Tex.1999). *See also* BLACK'S LAW DICTIONARY at 582 (8th ed.2004) (defining "erosion" in relevant part as "the gradual eating away of soil by the operation of currents or tides"). Avulsion, by contrast, as derived from English common law, is the sudden and perceptible change in land and is said not to divest an owner of title. *York,* 532 S.W.2d at 952. We have never applied the avulsion doctrine to upset the mean high tide line boundary as established by *Luttes.*[20] 324 S.W.2d at 191. We have previously recognized the import of gradual additions to oceanfront land holding that additions to the property above the high tide line caused by accretion belong to the upland owner. *State v. Balli,* 144 Tex. 195, 190 S.W.2d 71, 100 (1944); *see also Lakefront Trust, Inc. v. City of Port Arthur,* 505 S.W.2d 606, 608 (Tex.Civ.App.-Beaumont 1974, writ ref'd n.r.e.) (citing the general rule).

▮▮▮ On rehearing, respondents and the dissents of JUSTICE MEDINA AND JUSTICE LEHRMANN, along with several amici, contend that the legal distinction between avulsion and erosion is immaterial. On the contrary, the distinct legal consequences

---

**20.** Some states apply avulsion to determine that the mean high tide line as it existed before the avulsive event remains the boundary between public and private ownership of beach property after the avulsive event; therefore, allowing private property owners to retain ownership of property that becomes submerged under the ocean. *See Walton Cnty. v. Stop the Beach Renourishment, Inc.,* 998 So.2d 1102, 1116–17 (Fla.2008), *aff'd sub nom. Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot.,* — U.S. ——, 130 S.Ct. 2592, 177 L.Ed.2d 184 (2010); *Cinque Bambini P'ship v. State,* 491 So.2d 508, 520 (Miss.1986). We have not accepted such an expansive view of the doctrine, but we need not make that determination in this case.

arising from the difference between avulsive and gradual changes in land due to natural causes have been recognized in Texas law for over a century. *See Denny v. Cotton,* 3 Tex.Civ.App. 634, 22 S.W. 122, 125 (1893, writ ref'd) (stating the distinction in relation to riparian ownership). Avulsion is a rapid and perceptible change; accretion and erosion are gradual and imperceptible changes. *York,* 532 S.W.2d at 952 (concerning waters of the Houston Ship Channel) (citing *Denny,* 22 S.W. at 125); *Manry v. Robison,* 122 Tex. 213, 56 S.W.2d 438, 443–44 (1932) (discussing the effect of erosion as dispossessing riparian landowners of their title). "The rule is long established that a change is 'gradual and imperceptible' if 'though the witnesses may see, from time to time, that progress has been made, they could not perceive it while the progress was going on.'" *Brainard,* 12 S.W.3d 6, 18 (Tex.1999) (quoting *Denny,* 22 S.W. at 124); *see Nebraska v. Iowa,* 143 U.S. 359, 368, 12 S.Ct. 396, 36 L.Ed. 186 (1892). The venerable authority Sir William Blackstone explained in 1766, also in the context of property ownership, that different legal consequences are occasioned by gradual changes versus sudden changes: "... the law is held to be, that if th[e] gain be by little and little, by small and imperceptible degrees, it shall go to the owner of the land adjoining" but if the change be "sudden and considerable, in this case it belongs to the king." 2 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND [hereinafter BLACKSTONE, COMMENTARIES] *262 (1766); *see Cnty. of St. Clair v. Lovingston,* 90 U.S. 46, 23 Wall. 46, 67, 23 L.Ed. 59 (1874) (quoting Blackstone). "So that the quantity of the ground gained, and the time during which it is gaining, are what make it either the king's, or the subject's property." BLACKSTONE, COMMENTARIES *262; *see also York,* 532 S.W.2d at 952. Analogously, the legal implications of erosion differ from those of

avulsion in the context of easements. The holding in this case arises in part from the distinction between avulsive and gradual changes along the beach, but we do not decide whether this distinction in physical changes on the beaches necessarily has the same legal effects on riparian landowners.

Property along the Gulf of Mexico is subjected to hurricanes and tropical storms, on top of the everyday natural forces of wind, rain, and tidal ebbs and flows that affect coastal properties and shift sand and the vegetation line. This is an ordinary hazard of owning littoral property. And, while losing property to the public trust as it becomes part of the wet beach or submerged under the ocean is an ordinary hazard of ownership for coastal property owners, it is far less reasonable, and unsupported by ancient common law precepts, to hold that a public easement can suddenly encumber an entirely new portion of a landowner's property or a different landowner's property that was not previously subject to that right of use. *See, e.g., Phillips Petrol.,* 484 U.S. at 482, 108 S.Ct. 791 (discussing the importance of "honoring reasonable expectations in property interests[,]" but ultimately holding the property owner's expectations in that situation were unreasonable). Gradual movement of the vegetation line and mean high tide line due to erosion or accretion, as opposed to avulsion, has very different practical implications.

▆▆▆ Like littoral property boundaries along the Gulf Coast, the boundaries of corresponding public easements are also dynamic. The easements' boundaries may move according to gradual and imperceptible changes in the mean high tide and vegetation lines. However, if an avulsive event moves the mean high tide line and vegetation line suddenly and perceptibly, causing the former dry beach to become part of State-owned wet beach or com-

pletely submerged, the adjacent private property owner is not automatically deprived of her right to exclude the public from the new dry beach. In those situations, when changes occur suddenly and perceptibly to materially alter littoral boundaries, the land encumbered by the easement is lost to the public trust, along with the easement attached to that land. Then, the State may seek to establish another easement as permitted by law on the newly created dry beach and enforce an asserted public right to use the private land.

It would be impractical and an unnecessary waste of public resources to require the State to obtain a new judgment for each gradual and nearly imperceptible movement of coastal boundaries exposing a new portion of dry beach. These easements are established in terms of boundaries such as the mean high tide line and vegetation line; presumably public use moves according to and with those boundaries so the change in public use would likewise be imperceptible. Also, when movement is gradual, landowners and the State have ample time to reach a solution as the easement slowly migrates landward with the vegetation line. Conversely, when drastic changes expose new dry beach and the former dry beach that may have been encumbered by a public easement is now part of the wet beach or completely submerged under water, the State must prove a new easement on the area. Because sudden and perceptible changes by nature occur very quickly, it would be impossible to prove continued public use in the new dry beach, and it would be unfair, and perhaps unlawful, to impose such drastic restrictions through the OBA upon an owner in those circum-

stances without compensation. *See Westgate, Ltd. v. State*, 843 S.W.2d 448, 452 (Tex.1992) (explaining the circumstances from which an action for inverse condemnation may arise).

If the public is to have an easement on newly created and privately owned dry beach after an avulsive event, the State must prove it, as with other property. Having divested title to all such West Beach property in the early years of the Republic and of the State of Texas, the State can only acquire or burden private property according to the law. Thus, a public beachfront easement in West Beach, although dynamic, does not roll under Texas law. The public loses that interest in privately owned dry beach when the land to which it is attached becomes submerged underwater. While these boundaries are somewhat dynamic to accommodate the beach's everyday movement and imperceptible erosion and accretion, the State cannot declare a public right so expansive as to always adhere to the dry beach even when the land to which the easement was originally attached is violently washed away. This could divest private owners of significant rights without compensation because the right to exclude is one of the most valuable and fundamental rights possessed by property owners. *See Flower Mound*, 135 S.W.3d at 634 (quoting *Dolan v. City of Tigard*, 512 U.S. 374, 393, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994)). We have never held the dry beach to be encompassed in the public trust. *See Luttes*, 324 S.W.2d at 191–92.

We hold that Texas does not recognize a "rolling" easement.[21] Easements for public use of private dry beach property change size and shape along with the gradual and imperceptible erosion or accretion

---

21. This rule is a tenet of Texas common law, subject to ordinary grounds of modification, e.g., where private property rights for given

beach areas are altered in conveyances of those lands.

in the coastal landscape. But, avulsive events such as storms and hurricanes that drastically alter pre-existing littoral boundaries do not have the effect of allowing a public use easement to migrate onto previously unencumbered property. This holding shall not be applied to use the avulsion doctrine to upset the long-standing boundary between public and private ownership at the mean high tide line. The division between public and private ownership remains at the mean high tide line in the wake of naturally occurring changes, and even when boundaries seem to change suddenly.[22]

Declining to engraft a "rolling easement" theory onto Texas property law does not render the State powerless to regulate Texas shorelines, within constitutional limits. For example, the State, as always, may validly address nuisances or otherwise exercise its police power to impose reasonable regulations on coastal property, or prove the existence of an easement for public use, consistent with constitutional precepts.

The dissents would reach a different result, arguing the public has the right to use the dry beach regardless of the boundaries of private property or the legal protections accorded those rights. That approach would raise constitutional concerns. "To say that the appropriation of a public easement across a landowner's premises does not constitute the taking of a property interest but rather ... 'a mere restriction on its use,' ... is to use words in a manner that deprives them of all their ordinary meaning." *Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 831, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987) (citation omit-

ted). Legal scholars have opined on the subject.

Since a simple legislative declaration of policy, [such as declaring a right to an easement across private property], cannot provide the requisite due process, the affirmative policy statement of the Open Beaches Act, without more would appear patently unconstitutional. The legislature has apparently sought to avoid such constitutional problems by qualifying affirmatively-declared public rights with an interesting condition precedent. That condition is that the public must have *already acquired* these identical rights under the common law doctrines of prescription or dedication.

Elliott, 28 BAYLOR L.REV. at 385–86; *see also* Neal E. Pirkle, *Maintaining Public Access to Texas Coastal Beaches: the Past and the Future*, 46 BAYLOR L.REV. 1093, 1108 (1994) (noting that the consensus is that the OBA "creates no substantive rights for the public," but codifies existing common law). The legislature's Beach Study Committee opined that the OBA "does not and can not, declare that the public has an easement to the beach." BEACH STUDY COMM., FOOTPRINTS 17.

According to JUSTICE MEDINA'S AND JUSTICE LEHRMANN'S dissents, an easement could remain in the dry beach even if the land encumbered by the original easement becomes submerged by the ocean and the dry beach is composed of new land that was not previously encumbered by an easement. This argument is likewise based on the premise that an alleged easement previously established did not just encumber the dry beach portion of Severance's parcel, but that it encumbered the entire lot. This is inconsistent with ease-

---

**22.** We do not address how artificial accretions or other artificial changes in the coastal landscape affect ownership. *See New Jersey v. New York*, 523 U.S. 767, 783–84, 118 S.Ct. 1726, 140 L.Ed.2d 993 (1998) (explaining the littoral boundaries remained as they were before artificial land-filling increased the surface area of Ellis Island).

ment law. *See Holmstrom v. Lee,* 26 S.W.3d 526, 533 (Tex.App.-Austin 2000, no pet.) ("Once established, the location or character of the easement cannot be changed without the consent of the parties."); 7 THOMPSON ON REAL PROPERTY § 60.04(c)(1)(ii), at 538–40. While the specific use granted by an easement is a fundamental consideration, there is no persuasive Texas authority to support the dissents' contention that an easement forever remains in the dry beach, i.e., can move onto a new portion of the parcel or a different parcel, absent mutual consent or proof under law. *See* JON W. BRUCE & JAMES W. ELY, THE LAW OF EASEMENTS AND LICENSES IN LAND § 7:13, at 7–30 (2009). This would result in depriving oceanfront property owners of a substantial right (the right to exclude) without requiring compensation or proof of actual use of the property allegedly encumbered whenever natural forces cause the vegetation line to move inland so that property not formerly part of the dry beach becomes part of the dry beach. This argument blurs the line between ownership and right to use of a portion of a parcel—the dry beach—and is in tension with our decision in *Luttes* that set the boundary between State and privately owned property at the mean high tide line. *See* 324 S.W.2d at 191–92.

JUSTICE MEDINA's dissent also dismisses Severance's grievance as a gamble she took and lost by purchasing oceanfront property in Galveston and argues that she would not be entitled to compensation even though an easement had never been established on her parcel, a portion of which is now in the dry beach. It notes the OBA requirement of disclosure in executory contracts of the risk that property could become located on a public beach and subject to an easement in the future. *See* TEX. NAT. RES.CODE § 61.025. This is incorrect for three reasons. First, beachfront property owners take the risk that their property could be lost to the sea, not that their property will be encumbered by a easement they never agreed to and that the State never had to prove. Second, putting a property owner on notice that the State may attempt to take her property for public use at some undetermined point in the future does not relieve the State from the legal requirement of proving or purchasing an easement nor from the constitutional requirement of compensation if a taking occurs. We do not hold that circumstances do not exist under which the government can require conveyance of property or valuable property rights, such as the right to exclude, but it must pay to validly obtain such right or have a sufficient basis under its police power to do so. *See Nollan,* 483 U.S. at 841–42, 107 S.Ct. 3141 (noting that public use of private beaches may be a "good idea" but "if [the state] wants an easement across [private] property, it must pay for it."). As Justice Oliver Wendell Holmes, Jr. explained, "[A] strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change." *Pa. Coal Co. v. Mahon,* 260 U.S. 393, 416, 43 S.Ct. 158, 67 L.Ed. 322 (1922). Third, simply advising in a disclosure that the State may attempt to enforce an easement on privately owned beachfront property does not dispose of the owner's rights.

Our holding does not necessarily preclude a factual finding that an easement exists. We have determined that the history of land ownership in West Beach undermines the existence of a public easement "by virtue of continuous right in the public since time immemorial, as recognized in law and custom," TEX. NAT. RES. CODE § 61.001(8), and Texas law does not countenance an easement rolling onto previously unencumbered beachfront property

due to the hurricane. We do not have a sufficient record to determine whether an easement has been proven, and the question was not certified. *See Severance*, 566 F.3d at 503–04.

## B. Inherent Limitations on Private Property Rights

The public may have a superior interest in use of privately owned dry beach when an easement has been established on the beachfront. But it does not follow that the public interest in the use of privately owned dry beach is greater than a private property owner's right to exclude others from her land when no easement exists on that land. A few states have declared that longstanding property principles give the state (and therefore, the public) the right to use even privately owned beachfront property. For example, the Oregon Supreme Court has held that the dry beach is subject to public use because the public use was presumed inherent in the history of title transfers to such lands. *Stevens v. City of Cannon Beach*, 317 Or. 131, 854 P.2d 449, 456 (1993) (citing *State ex rel. Thornton v. Hay*, 254 Or. 584, 462 P.2d 671 (1969)). The state of Oregon's view is that private property owners along the beach "never had the property interests that they claim were taken" in the dry sand, the area between the high water line and vegetation line. *Id.* at 457. The Court explained "the common-law doctrine of custom as applied to Oregon's ocean shores ... is not 'newly legislated or decreed'; to the contrary, to use the words of the *Lucas* court, it 'inhere[s] in the title itself, in the restrictions that background principles of the State's law of property and nuisance already placed upon land ownership." *Id.* at 456 (quoting *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1004, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992)). The Supreme Court of Hawaii has held that issuance of a Hawaiian land patent

confirms only a limited property interest as compared to typical land patents on the continental United States. *See Pub. Access Shoreline Haw. v. Haw. Cnty. Planning Comm'n*, 79 Hawai'i 425, 903 P.2d 1246, 1268 (1995). It explained that "the western concept of exclusivity is not universally applicable in Hawai'i" in the context of private property rights. *Id.* New Jersey extends the public trust doctrine to encompass use of the dry beach as well as public ownership of the wet beach. *See Borough of Neptune City v. Borough of Avon–by–the–Sea*, 61 N.J. 296, 294 A.2d 47, 49 (1972) ("[T]he public trust doctrine dictates that the beach and the ocean waters must be open to all on equal terms and without preference...."); *see also Matthews v. Bay Head Improvement Ass'n*, 95 N.J. 306, 471 A.2d 355, 365 (1984). Unlike the West Beach of Galveston Island, these jurisdictions have longstanding restrictions inherent in titles to beach properties or historic customs that impress privately owned beach properties with public rights.

On the other hand, the Supreme Court of New Hampshire held that a statute that recognized a general recreational easement for public use in the "dry sand area" (comparable to our dry beach), violates the takings provisions of the state and federal constitutions, except for those areas where there is an "established and acknowledged public easement." *Opinion of the Justices*, 139 N.H. 82, 649 A.2d 604, 609 (1994). The public trust ends at the high water mark and private property extends landward beyond that. *Id.* at 608. The Supreme Court of Idaho applied the public trust doctrine to Lake Coeur d'Alene and held that the public trust doctrine was inapplicable in an action to force owners to remove a seawall. *State ex rel. Haman v. Fox*, 100 Idaho 140, 594 P.2d 1093 (1979). The private property at issue was obtained

by patent from the U.S. Government in 1892 and the seawall was built above the mean high water mark of the lake. *Id.* at 1095, 1102.

## C. Custom in Texas

A few Texas courts of appeals have reached results contrary to the holding in this opinion. In *Feinman v. State,* the court held that public easements for use of dry beach can roll with movements of the vegetation line. 717 S.W.2d 106, 110–11 (Tex.App.-Houston [1st Dist.] 1986, writ ref'd n.r.e.). The reasoning in the *Feinman* opinion includes little to support this conclusion in the context of avulsive changes to the oceanfront.[23] *Feinman* states that "[c]ourts have upheld the concept of a rolling easement along rivers and the sea for many years without using the phrase 'rolling easement,' " and cites, but does not discuss, seven cases for its holding.[24] *Id.* at 110. Only one of the opinions is from a Texas court, *Luttes,* and neither it nor the other cited cases discuss rolling easements. *Feinman* further cited no Texas authority for the contention that a continuous right or custom dating from "time immemorial" is a basis to encumber private property rights along West Beach. *Id.* Our decision in *Luttes* established the landward boundary of title to the public trust along Gulf-front beaches and it likewise does not address rolling easements.

*See* 324 S.W.2d at 167. The *Sotomura* opinion is based on different common law notions of public rights to and limitations on private ownership of beaches in Hawaii, as discussed above. *Cnty. of Haw. v. Sotomura,* 55 Haw. 176, 517 P.2d 57, 61 (1973). And *Feinman* neither addressed the legal significance of the Jones and Hall grant on the question of public encumbrance on private beach properties of Galveston's West Beach nor identified any basis in historic Texas law for a continuous legal right or custom on which to ground the existence of a rolling easement. *Feinman*'s specific holding is that a rolling easement is "implicit" in the OBA, a conclusion with which we do not agree. *See* 717 S.W.2d at 111.

The State's reliance on *Feinman* for the conclusion that a rolling easement exists by virtue of custom on private beachfront property generates significant tension with the prior decision of *Seaway,* which determined there was no such rule of law.

It would no doubt have been good policy for the Republic to have reserved the right of ingress and egress [in the Jones and Hall Grant] so the people could more effectively enjoy the State-owned seashore and waters, but the plain language of the grant shows the Republic of Texas did not do so.... The sovereign must fully honor its valid conveyances and contracts. We do not know that we clearly comprehend the appel-

---

**23.** To the extent that *Feinman*'s analysis concerns only gradual changes to the beachfront, it is generally consistent with our holding today. *See* 717 S.W.2d at 110. *Feinman* does not consider the legal implications of the difference between avulsive and gradual changes to the coast, concluding the distinction to be immaterial to its decision because it apparently viewed the distinction not relevant to the question of an easement, only title to property. *See* 717 S.W.2d at 114–15. We disagree with the latter conclusion.

**24.** The cited cases are *Barney v. City of Keokuk,* 94 U.S. 324, 339–40, 24 L.Ed. 224 (1876); *Luttes,* 324 S.W.2d 167; *Cnty. of Haw. v. Sotomura,* 55 Haw. 176, 517 P.2d 57, 61 (1973); *Horgan v. Town Council,* 32 R.I. 528, 80 A. 271 (1911); *City of Chicago v. Ward,* 169 Ill. 392, 48 N.E. 927 (1897); *Godfrey v. City of Alton,* 12 Ill. 29, 36 (1850); and *Mercer v. Denne,* [1905] 2 Ch. 538 (Eng.). *Feinman* issued two months after *Matcha v. Mattox,* 711 S.W.2d 95 (Tex.App.-Austin 1986, writ ref'd n.r.e.), and does not cite it for support of a migratory easement. 717 S.W.2d at 113.

lees' position that the judgment can be upheld on the theory that the use of the beach by the public has become a part of our tradition and common law and the easement exists by reason of continuous right in the public. We suppose they seek to have us hold that the seashore is held in trust by the sovereign at common law for the people and to enjoy it there must be a means of egress and ingress to enable them to enjoy such use and therefore the sovereign has no power to cut off convenient access. *We know of no such rule of law. In our extensive research we have found no cases so holding nor have any been cited us.*

375 S.W.2d at 929 (emphasis added). *Feinman* reached the same conclusion. 717 S.W.2d at 110–11. *Feinman* did not hold that custom supported imposition of a public easement, explicitly stating it was unnecessary to do so. 717 S.W.2d at 113. Instead, *Feinman* held that an easement by implied dedication had been proven by "[e]vidence show[ing] daily systematic use of the whole area," while the State in this case asserts that such proof is not necessary. *Id.*[25]

One other appellate decision also recognizes a rolling easement, relying on *Feinman* and *Matcha v. Mattox*. *See Arrington v. Tex. Gen. Land Office*, 38 S.W.3d 764, 766 (Tex.App.-Houston [14th Dist.] 2001, no pet.) (citing both *Feinman* for the proposition that a rolling easement is "implicit" in the OBA and *Matcha v. Mattox*, 711 S.W.2d 95, 100 (Tex.App.-Austin 1986, writ ref'd n.r.e.), for the idea that established public beach easements may "shift[ ] with the natural movements of the beach"). Finally, the *Seaway* opinion did not address the issue of a rolling easement but held that the State proved an easement by evidence submitted to a jury at trial, interestingly relying on testimony that the line of vegetation at issue had remained the same "for at least 200 years." 375 S.W.2d at 927, 930, 939.

The first Texas case to address the concept of a rolling easement in Galveston's West Beach is *Matcha v. Mattox*. In 1983, Hurricane Alicia shifted the vegetation line on the beach such that the Matchas' home had moved into the dry beach. *Id.* at 96. The court held that legal custom—"a reflection in law of a long-standing public practice"—supported the trial court's determination that a public easement had "migrate[d]" onto private property. *Id.* at 100. The court reasoned that Texas law gives effect to the long history of recognized public use of Galveston's beaches, citing accounts of public use dating back to time immemorial, 1836 in this case. The *Matcha* opinion, as with *Feinman*, fails to cite any Texas authority holding that custom establishes a rolling beachfront easement.

Even if a custom of public use on West Galveston beaches were recognized, the State would still have to establish the basis in custom of the right in the public to a rolling easement to have existed since time immemorial. The *Matcha* court's upholding, based on proof at trial, of longstanding "custom" in public use of Galveston's beaches would still fall short of establishing that a custom existed to give effect to a legal concept of a rolling easement, which would impose inherent limitations on private property rights. 711 S.W.2d at 100; *see Trepanier v. Cnty. of Volusia*, 965 So.2d 276, 293 (Fla.App.2007) (criticizing

---

**25.** Alternatively, the State contends that this Court should take judicial notice of such evidence discussed in cases several decades old. But even the State's cited authority declined to rely on a trial court judgment purporting to adjudicate the vegetation line because it was "not of record in this appeal." *See Matcha*, 711 S.W.2d at 100.

*Matcha* for making a policy judgment that a public easement migrates and noting the distinction between a custom of use and whether such right of use is migratory); *cf. Scureman v. Judge,* 747 A.2d 62, 67–68 (Del.Ch.1999) (rejecting application of the "rolling easement" concept in *Feinman*).

None of the four Texas courts of appeals cases cited in support of a rolling easement date back to time immemorial nor do they provide a legal basis for recognizing the claimed inherent limitation on West Galveston property titles or continuous legal right since time immemorial. We disapprove of the courts of appeals opinions to the extent they are inconsistent with our holding in this case. *See Arrington v. Tex. Gen. Land Office,* 38 S.W.3d 764, 766 (Tex. App.-Houston [14th Dist.] 2001, no pet.); *Feinman,* 717 S.W.2d at 108–11; *Moody v. White,* 593 S.W.2d 372, 379 (Tex.Civ.App.- Corpus Christi 1979, no writ); *Matcha,* 711 S.W.2d at 98–100; *but see* Pirkle, 46 BAYLOR L.REV. at 1106–07 (questioning whether the rolling easement theory should apply to easements by prescription and dedication).

In her dissent, JUSTICE GUZMAN argues that the Court should split the baby by pronouncing that private property owners must forfeit to the State some but not all of their property rights, notwithstanding the absence of proof of an easement and without the payment of just compensation. She contends that the State can order beachfront property owners to let the public use their private land in the dry beach as long as the house on the land is not ordered removed. Her view would create an anomalous circumstance in which a homeowner on the West Galveston beachfront could, sitting in her den, look out her window, without recourse, as strangers play beach volleyball in her yard. Under JUSTICE GUZMAN's dissent, the private homeowner would have no right to keep strangers from using the property she purchased surrounding her beachfront home.

The State's position and the dissents suffer from the same fundamental flaw. They all fail to cite any authority for the proposition that background principles of Texas property law preclude private beachfront property owners from ever having had the right to exclude strangers from their land, as other Texas property owners do. The Texas appellate opinions discussed, being at most a few decades old, are not authority going back to "time immemorial" and they do not cite any authority for such an ancient, inherent limitation. *See* Pirkle, 46 BAYLOR L.REV. at 1108 (stating that "English courts required custom to be immemorial, in other words, dating back to before King Richard I" (King of England from 1189–1199), and in translating the concept of "time immemorial" to Texas, concluding that if Spanish or Mexican civil law governed at the time of the original grant, "the public would have no customary right" in the lands) (citing *Delaplane v. Crenshaw,* 56 Va. (15 Gratt.) 457, 473 (Va.1860)). In fact, the one authority to specifically discuss the topic expressly refutes the existence of any such legal authority in Texas. *See Seaway,* 375 S.W.2d at 929.

JUSTICE GUZMAN's dissent cites the *Menard* case and a dissent in *Luttes v. State,* 159 Tex. 500, 324 S.W.2d 167, 197 (1959) (Smith, J., dissenting, on motion for rehearing), for the proposition that there should be a "balance between public and private use" of the seashore as a predicate for her conclusion that the public has a right to use private property. *See City of Galveston v. Menard,* 23 Tex. 349 (Tex. 1859). She quotes *Menard,* at 394:

> This *species of property,* being land covered with navigable water, embraces several rights that may be separated,

and enjoyed by different persons, and may become thereby, *partly private and partly public;* as, the right to the soil, a right to fish in its waters, the right to navigate the waters covering it, etc.

370 S.W.3d 705 (Guzman, J., dissenting) (emphasis added). She then pronounces a "historic presumption of the public's right to use the dry beach." *Id.* at 746. Of course, the dissent in *Luttes* is not precedential. Importantly, the "species of property" in dispute in *Menard* is a grant to "that part of the Galveston bay ... usually covered with salt water, which constitute[s] what is called the 'flats.'" *Menard,* 23 Tex. at 391. The reasoning in *Menard* concerns property that is entirely underwater or within the wet beach, i.e., property in the public trust owned by the State. It is inapposite to the Kennedy Beach property in the dry beach in this case and does not support the contention that private property owners in the dry beach must share their land with anyone who wishes to use it for beach recreation. While JUSTICE GUZMAN accurately quotes the case, the *Menard* opinion makes clear that the "shore" to which she refers does not include the dry beach. *Id.* at 399–400 (noting that the "shore" extended "to the line of the highest tide in winter" under the civil law but only to the "line of ordinary high tide" at common law). The State's and the dissents' contention also fails to explain the source of such limitations on beachfront property rights in light of the Republic's and the State's unrestricted conveyances in the Jones and Hall grant of this previously state-encumbered land to private owners at the inception of the Republic and reaffirmed by the Legislature after Texas became a state. *See Seaway,* 375 S.W.2d at 929 ("We may not imply such a reservation in the face of the language of the grant even though there is evidence that there was a road down the beach at the time of the grant.").

Although not clear, it appears the State and the dissents also contend that Galveston's West Beach property owners lost the right to exclude the public from their private property after Texas became a state through some type of custom, notwithstanding the position's implicit acknowledgment that they have failed to establish such a right "since time immemorial." Their reasoning is hard to discern. They seem to argue that evidence, in other cases, of use of beach parcels washed away decades ago is sufficient to establish a custom justifying encumbrance of private properties on the beachfront today. As pointed out, there is no evidence in this record of such use. However, they attempt to characterize proof in other cases of prior public use on different beachfront properties as a type of legally cognizable custom that is sufficient to pronounce a current right in the public to use private West Galveston property today. Their position juxtaposes evidence of public use with the existence of a legal custom they contend establishes a public easement, arguing that the former proves the latter. That reasoning melds the concept of a legal custom with proof of an easement and begs the question, why the State does not simply prove up an easement to encumber private homeowners' properties. And they do not explain the logic of extrapolating their view of such a custom from judicially noticed evidence of public use in one area throughout the entirety of Texas' ocean shores. Crediting that view would dispossess many beachfront property owners along the Texas coast of the land they purchased, raise constitutional questions and bring into consideration, potentially, tremendous liability of the State for just compensation.

Alternatively, they seem to theorize that custom is a legal doctrine that need not be proven, just recognized by a judge. That

view is unsupported by historic jurisprudence of this State and we decline the invitation to pronounce such a limitation on private property rights today. Their view also raises paramount concern for the constitutions' protection of this individual liberty. Without just compensation for a public purpose, neither the federal nor the state constitution allows a taking nor JUSTICE GUZMAN's theorized partial taking of private property. The Court's holding is consistent with constitutional protections of individual property rights, and effectuates the OBA's protection of public right to use public beachfront property that is either "acquired" by prescription or dedication or "retained by virtue of continuous right in the public since time immemorial...." *See* TEX. NAT. RES.CODE § 61.001(8).

## IV. Conclusion

Land patents from the Republic of Texas in 1840, affirmed by legislation in the new State of Texas a few years later, conveyed the State's title in West Galveston Island to private parties and reserved no ownership interests or rights to public use in Galveston's West Beach. Texas law has not otherwise recognized such an inherent limitation on property rights along the West Beach. Accordingly, there are no inherent limitations on title or continuous rights in the public since time immemorial that serve as a basis for engrafting public easements for use of private West Beach property. Although existing public easements in the dry beach of Galveston's West Beach are dynamic, as natural forces cause the vegetation and the mean high tide lines to move gradually and imperceptibly, these easements do not spring or roll landward to encumber other parts of the

parcel or new parcels as a result of avulsive events. New public easements on the adjoining private properties may be established if proven pursuant to the Open Beaches Act or the common law.[26]

Justice WILLETT delivered a concurring opinion.

Justice MEDINA delivered a dissenting opinion, in which Justice LEHRMANN joined and Justice GUZMAN joined in part.

Justice GUZMAN delivered a dissenting opinion.

Justice LEHRMANN delivered a dissenting opinion, in which Justice MEDINA joined.

Chief Justice JEFFERSON did not participate in the decision.

Justice WILLETT, concurring.

I join the Court's opinion and write separately to underscore a point easily overlooked by casual readers: Today's decision centers on West Galveston Island, not the entire Gulf Coast.

The Fifth Circuit asks broadly whether Texas law mandates an unproven rolling easement on *all* private Gulf-front beaches. While holding generally that such an easement is not embedded in Texas common law (unlike the State's right to submerged land), the Court focuses its analysis on Severance's property, emphasizing the unique historical lineage of title to West Galveston Island. The Court recognizes, if obliquely, that Texas's 367–mile shoreline is governed by different land patents and conveyances that may impose varying limitations, including encumbrances for public use. In short, the absence of a common-

---

**26.** We need not address whether the OBA is the exclusive means to establish public beach-front easements.

law theory of an easement that leaps onto private land upon which the public has never set foot in no way forecloses the State from proving an easement the old-fashioned way, using traditional means. Upshot: Easements may well burden private Gulf Coast properties, including on West Galveston Island—but they must be proved, not merely presumed.

Justice MEDINA, joined by Justice LEHRMANN and, in part, by Justice GUZMAN, dissenting.

Texas beaches have always been open to the public. The public has used Texas beaches for transportation, commerce, and recreation continuously for nearly 200 years.[1] The Texas shoreline is an expansive yet diminishing[2] public resource, and we have the most comprehensive public beach access laws in the nation. Since its enactment in 1959, the Texas Open Beaches Act ("OBA") has provided an enforcement mechanism for the public's common law right to access and to use Texas beaches.[3] The OBA enforces a reasoned balance between private property rights and the public's right to free and unrestricted use of the beach.[4] Today, the Court's holding disturbs this balance and jeopard-

1. Historical records indicate that a ferry from Galveston Island at San Luis Pass was established in 1836. *Seaway Co. v. Attorney Gen.*, 375 S.W.2d 923, 931 (Tex.Civ.App.-Houston 1964, writ ref'd n.r.e.). To travel between the City of Galveston Island and the ferry, the public traveled by beach route. *Id.* There is evidence of an established stage coach route traveling across the beach, and on May 23, 1838, the Republic of Texas authorized a mail route to run across the beach, which ran every two weeks. *Id.* Until Termini Road was built in 1956, "the only way to travel, except by private road inland within fenced land, was by way of the beach." *Id.* at 932. Testimony from earlier cases indicates that both locals and visitors to Galveston Island used the entire beach, "from the water line to the line of vegetation[,]" for driving, camping, fishing, and swimming. *Id.* (testimony of lifetime resident born in 1879). Cars parked between the dunes for camping. *Id.* at 933. Finally, there is no evidence that fences were ever erected across any part of the beach, only evidence that they were landward of the vegetation line to prevent cattle from going onto the beach. *Id.* (testimony of lifetime resident since 1875 reasoning that there were no fences because "[n]o one would dream any such thing as to block the driveway, ... and the driveway was in use, I am satisfied, at least more than a hundred years ago").

2. Not only is Texas's coastline expansive, we also have the highest erosion rate in the nation, affecting "five to six feet of sand annually." Michael Hofrichter, *Texas's Open Beaches Act: Proposed Reforms Due to Coastal Erosion*, 4 ENVT'L & ENERGY L. & POL'Y J.

147, 148 (2009). This erosion rate causes coastal property lines to change annually.

3. The OBA only applies to public beaches that border the Gulf of Mexico and are accessible by public road or ferry. TEX. NAT. RES.CODE §§ 61.013(c), 61.021.

4. *See id.* § 61.0184 (providing procedural safeguards for property subject to OBA enforcement actions). It should be noted that while the General Land Office contacted Severance to tell her that it *might* file an enforcement action to remove her encroachment on the public beach, the Office had not yet initiated such an action at the time of the litigation that gave rise to these certified questions. Justice Wiener's dissent in Severance's federal action is particularly worth noting. He maintains that this action "has the unintentional effect of enlisting the federal courts and, via certification, the Supreme Court of Texas, as unwitting foot-soldiers in this thinly veiled Libertarian crusade" whose quest ends with the evisceration of the Open Beaches Act. *Severance v. Patterson*, 566 F.3d 490, 504 (5th Cir.2009) (Wiener, J., dissenting). He argues further that beyond her claim not being ripe, Severance does not have standing because she attempts "to seek a benefit based on prior state action to which she has not only acceded and thereby forfeited or waived any related claim, but for which she has presumably been remunerated through an intrinsic diminution in the purchase price that she paid when she bought the already burdened beachfront land." *Id.* at 505.

izes the public's right to free and open beaches.

After chronicling the history of Texas property law, the Court concludes that easements defined by natural boundaries are, by definition, dynamic. 370 S.W.3d 705. Yet, in a game of semantics, the Court finds that such dynamic easements do not "roll." *Id.* at 724. The Court further distinguishes between movements by accretion and erosion and movements by avulsion, finding that gradual movements shift the easement's boundaries but sudden movements do not. The Court's distinction protects public beach rights from so-called gradual events such as erosion but not from more dramatic events like storms, even though both events are natural risks known to the property owner. Because the Court's vague distinction between gradual and sudden or slight and dramatic changes to the coastline jeopardizes the public's right to free and open beaches, recognized over the past 200 years, and threatens to embroil the state in beach-front litigation for the next 200 years, I respectfully dissent.

## I. Texas Coastal Property Ownership

Property lines on the coast are defined by migratory, dynamic boundaries. In *Luttes v. State*, we determined that Anglo–American common law applied to land

grants after 1840 [5] and thus affixed the mean high tide as the boundary between state and private ownership of land abutting tidal waters. 159 Tex. 500, 324 S.W.2d 167 (1958). The beach is commonly known to lie between the mean low tide and vegetation line. For over fifty years, the OBA has assimilated that common knowledge as a statutory definition as well. All land seaward of the mean high tide,[6] known as the wet beach, is held by the state in public trust. *Luttes*, 324 S.W.2d at 191–93; *see State v. Balli*, 144 Tex. 195, 190 S.W.2d 71, 100 (1945) (recognizing the "ancient maxim that seashore is common property and never passes to private hands"). The land between the mean high tide and the vegetation line is the dry beach and may be privately owned. *Luttes*, 324 S.W.2d at 191–93. I agree with the Court that "[w]e have never held the dry beach to be encompassed in the public trust." 370 S.W.3d 705. If this case were a matter of title, *Luttes* would provide the answer: the mean high tide separates public and private property ownership interests. But this case is about the enforcement of a common law easement that preserves the public's right to access the dry beach.

The mean low tide, mean high tide, and vegetation line are transitory.[7] Landown-

5. Texas adopted the common law in 1840, which established the mean high tide as the boundary dividing the state-owned seashore from private property. *Luttes*, 324 S.W.2d at 169. For land grants or patents that became effective before 1840, Mexican/Spanish civil law applies, which recognized this tidal boundary to be the mean higher high tide. *Id.* Because the mean high tide is measured with tide gauges and calculates both daily high tides, it provides a more definitive boundary line than the mean higher high tide, which only considers the higher of the two daily tides. *Id.* at 187 (recognizing the difficulty in proving "on such and such an occasion in such and such a year or years one or

more 'highest waves' actually reached this or that irregular line on the ground").

6. "[T]he average of highest daily water computed over or corrected to the regular tidal cycle of 18.6 years" is the mean high tide. *Luttes*, 324 S.W.2d at 187.

7. The mean low tide and high tide are averages assessed over a period of years. Their "actual determination at a given point on the coastline requires scientific measuring equipment and complex calculations extending over a lengthy period. Thus, as a practical matter, such physical determination of the landowner's actual boundary is not normally

ers may own property up to the mean high tide. But the exact metes and bounds of the beachfront property line cannot be ascertained with any specificity at any given time other than by reference to the mean high tide. Through shoreline erosion, hurricanes, and tropical storms, these lines are constantly moving both inland and seaward. In the West Bay system, whence this litigation arose, forty-eight percent of the shoreline is retreating, forty-seven percent is stable, and six percent is advancing, at an average rate of –2.9 feet per year.[8] The beaches on west Galveston Island, where Severance's property is located, have even higher retreat rates (a loss of over seven feet per year) because of their exposure to winds and waves.[9] Natural erosion from waves and currents causes an overall shoreline retreat for the entire Texas coast.[10]

These natural laws have compelled Texas common law to recognize rolling easements.[11] Easements that allow the public access to the beach must roll with the changing coastline in order to protect the public's right of use. The dynamic principles that govern vegetation and tide lines must therefore apply to determine the boundaries of pre-existing public beachfront easements. *See Matcha v. Mattox*, 711 S.W.2d 95, 100 (Tex.App.-Austin 1986, writ ref'd n.r.e.) *cert. denied*, 481 U.S. 1024, 107 S.Ct. 1911, 95 L.Ed.2d 517 (1987) ("An easement fixed in place while the beach moves would result in the easement being either under water or left high and dry inland, detached from the shore. Such an easement, meant to preserve the public right to use and enjoy the beach, would then cease functioning for that purpose."). "The law cannot freeze such an easement at one place anymore than the law can freeze the beach itself." *Id.*

## II. Texas Recognizes Rolling Easements

The first certified question asks whether Texas recognizes rolling beachfront access easements that move with the natural boundaries by which they are defined. The answer is yes. The rolling easement "is not a novel idea." *Feinman*, 717 S.W.2d at 110. Courts consistently recognize the migrating boundaries of easements abutting waterways to uphold their purpose.[12] *Id.* After all, "an easement is

---

feasible." Richard Elliot, *The Texas Open Beaches Act: Public Rights to Beach Access*, 28 BAYLOR L.REV. 383, 385 (1976). "The line of vegetation, on the other hand, is readily determinable with the naked eye at most points along the Gulf beaches." *Id.* However, all three lines are subject to the daily movements of ocean, which shift these lines both gradually and suddenly.

8. Gibeaut, J. C., Waldinger, Rachel, Hepner, Tiffany, Tremblay, T. A., and White, W. A., 2003, Changes in bay shoreline position, West Bay system, Texas: The University of Texas at Austin, Bureau of Economic Geology, report of the Texas Coastal Coordination Council pursuant to National Oceanic and Atmospheric Administration Award No. NA07OZ0134, under GLO contract no. 02–225R, 27 p. 14.

9. *Id.*

10. *Id.*

11. The Open Beaches Act recognizes that beaches on the Gulf should be free and unrestricted for the public's use and enjoyment. *See* TEX. NAT. RES.CODE § 61.011(a). And Texas case law has recognized the rolling nature of public beachfront easements. *Feinman v. State*, 717 S.W.2d 106, 111 (Tex.App.-Houston [1st Dist.] 1986, writ ref'd n.r.e.); *Matcha v. Mattox*, 711 S.W.2d at 99; *Arrington v. Tex. Gen. Land Office*, 38 S.W.3d 764, 766 (Tex. App.-Houston [14th Dist.] 2001, no pet.); *Arrington v. Mattox*, 767 S.W.2d 957, 958 (Tex. App.-Austin 1989, writ denied), *cert. denied*, 493 U.S. 1073, 110 S.Ct. 1119, 107 L.Ed.2d 1026 (1990).

12. This concept has long been recognized by courts across numerous jurisdictions. *See Barney v. City of Keokuk*, 94 U.S. (4 Otto) 324,

not so inflexible that it cannot accommodate changes in the terrain it covers." *Id.*

The law of easements, Texas law, and public policy support the enforcement of rolling easements. Such easements follow the movement of the dry beach in order to maintain their purpose and are defined by such purpose rather than geographic location. They are therefore affected by changes to the coast but never rendered ineffective by the change. The primary objective is not to ensure the easement's boundaries are fixed but rather that its purpose is never defeated.

## A. Texas Easement Law

An easement is a non-possessory property interest that authorizes its holder to use the property of another for a particular purpose. *Marcus Cable Assocs. v. Krohn*, 90 S.W.3d 697, 700 (Tex.2002). "A grant or reservation of an easement in general terms implies a grant of unlimited reasonable use such as is reasonably necessary and convenient and as little burdensome as possible to the servient owner." *Coleman v. Forister*, 514 S.W.2d 899, 903 (Tex.1974). However, the burden on the servient estate is secondary to ensuring that the purpose of the easement is reasonably fulfilled. For example, oil and gas leases convey an implied easement to use the surface as reasonably necessary to fulfill the purpose of the lease. *See Sun Oil Co. v. Whitaker*, 483 S.W.2d 808, 810 (Tex. 1972) (recognizing that the use easement is not limited by fixed boundaries but rather its purpose and use). The purpose of the easement cannot expand, but under certain circumstances, the geographic location of the easement may. *Compare Marcus Cable Assocs.*, 90 S.W.3d at 701 (preventing easement holder from expanding purpose of maintaining electric transmission or distribution line to also include cable-television lines regardless of fact that lines could be run on exact same geographic location) *with Godfrey v. City of Alton*, 12 Ill. 29 (1850) (recognizing that a public easement for a public landing on specific waterway is necessarily "inseparable from the margin of the water, however that may fluctuate").

Easements may be express or implied. Implied easements are defined by the circumstances that create the implication. *Ulbricht v. Friedsam*, 159 Tex. 607, 325 S.W.2d 669, 677 (1959) (finding an implied easement to use lake water for cattle as they were located upland and without any water source). Express easements, however, must comply with the Statute of Frauds, which requires a description of the easement's location. *Pick v. Bartel*, 659 S.W.2d 636, 637 (Tex.1983). Under certain

339–40, 24 L.Ed. 224 (1876) (finding no taking and public use easement boundaries moved after city filled in and expanded street that wharfed out to banks of Mississippi River for public use); *Luttes*, 324 S.W.2d at 167; *Cnty. of Hawaii v. Sotomura*, 55 Haw. 176, 517 P.2d 57, 62 (1973) (defining seaward property boundary to fall on the "upper reaches of the wash of the waves"); *Horgan v. Town Council of Jamestown*, 32 R.I. 528, 80 A. 271, 276 (1911) (defining boundaries of public highway abutting waterway to be flexible); *City of Chi. v. Ward*, 169 Ill. 392, 48 N.E. 927 (1897) (upholding a statute mandating that lands shall be held for the use and purposes expressed or intended); *Godfrey v. City of Alton*, 12 Ill. 29, 35 (1850) (finding easement by dedication for public landing must attach to the waterway, "however that may fluctuate," otherwise "its enjoyment would be precarious, and often destroyed"); *Mercer v. Denne*, [1905] 2 ch. 538 (Eng.) (recognizing a public easement by custom for fishermen to dry nets on the new portion of the beach that had been added to the old beach overtime); *Louisiana v. Mississippi et al.*, 516 U.S. 22, 25, 116 S.Ct. 290, 133 L.Ed.2d 265 (1995) (applying rule that boundaries between states along a river may naturally shift in accordance with changes in the river channel); *Georgia v. South Carolina*, 497 U.S. 376, 403–04, 110 S.Ct. 2903, 111 L.Ed.2d 309 (1990) (same); *Nebraska v. Iowa*, 143 U.S. 359, 360, 12 S.Ct. 396, 36 L.Ed. 186 (1892) (same).

circumstances, even express easement boundaries may be altered to maintain the purpose of the easement. *See Kothmann v. Rothwell*, 280 S.W.3d 877, 880 (Tex. App.-Amarillo 2009, no pet.) (recognizing movement of drainage tracts to maintain easement's purpose despite the expansion of original easement location); *see also* RESTATEMENT (THIRD) OF PROPERTY (SERVITUDES) § 4.1 (2000) (providing that an easement "should be interpreted to give effect to the intention of the parties ascertained from the language used in the instrument, or the circumstances surrounding the creation of the servitude, and to carry out the purpose for which it was created"). ·

Rolling beachfront access easements are implied by prescription or continuous use of the dry beach and are defined by their purpose and their dynamic, non-static natural boundaries. To apply static real property concepts to beachfront easements is to presume their destruction. Hurricanes and tropical storms frequently batter Texas's coast. Avulsive events are not uncommon. The Court's failure to recognize the rolling easement places a costly and unnecessary burden on the state if it is to preserve our heritage of open beaches.

The Court's conclusion that beachfront easements are dynamic but do not roll defies not only existing law but logic as well. The definition of "roll" is "to impel forward by causing to turn over and over on a surface." Webster's Ninth New Collegiate Dictionary (Merriam–Webster Inc. 1983). "Dynamic" means "of or relating to physical force or energy" and "marked by continuous activity or change." *Id.* Both terms express movement, but neither term is limited by speed or degree of movement.

The Court also illogically distinguishes between shoreline movements by accretion and avulsion. On the one hand, the Court correctly declines to apply the avulsion doctrine to the mean high tide. 370 S.W.3d 705. This means a property owner loses title to land if, after a hurricane or tropical storm, such land falls seaward of the mean high tide. On the other hand, this same hurricane, under the Court's analysis, requires the state to compensate a property owner for the land that now falls seaward of the vegetation line unless it was already a part of the public beachfront easement. Under the Court's analysis, the property line may be dynamic but beachfront easements must always remain temporary; the public's right to the beach can never be established and will never be secure.[13]

The Court's distinctions nullify the purpose of rolling easements. I submit (in accord with several other Texas appellate courts that have addressed the issue of rolling easements) that natural movements of the mean high tide and vegetation line, sudden or gradual, re-establish the dynamic boundaries separating public and private ownership of the beach, as well as a pre-existing public beachfront access easement. So long as an easement was established over the dry beach before the avulsive event, it must remain over the new dry beach without the burden of having to re-establish a previously existing easement whose boundaries have naturally shifted.

Finally, I submit that once an easement is established, it attaches to the entire tract. *Drye v. Eagle Rock Ranch, Inc.*, 364 S.W.2d 196, 207 (Tex.1963). Regardless of how many times the original tract is subdivided, the easement remains. *Id.*

---

13. The Court treats the public's easement as "fixed and definite," which creates "a legal fiction that has no factual basis." Mike Ratliff, *Public Access to Receding Beaches*, 13 HOUS. L.REV. 984, 1014 (1976). Only a "rolling easement will realistically and accurately depict the actual occurrences on the beach." *Id.*

(enforcing pre-existing implied easement across subsequently divided tracts to fulfill its purpose).

Private ownership of Galveston Island originated in two land grants issued by the Republic of Texas. First, it arose from the *Menard* Grant in 1838, which covers the east end of the Island. *See Seaway Co.*, 375 S.W.2d at 928; *City of Galveston v. Menard*, 23 Tex. 349, 403–04 (1859). Second, it issued from the Jones and Hall Grant in 1840, which encompasses 18,215 acres, and includes the West Beach, where Severance's property is located. *See Seaway Co.*, 375 S.W.2d at 928 (covering "all of Galveston Island except the land covered by the *Menard* Grant covering the east portion of the Island").

The Court today reasons that because no *express* easement was made in these original land grants, no public easement can exist over the dry beach. 370 S.W.3d 705. The Court, however, ignores the implied easement arising from the public's continuous use of the beach for nearly 200 years. The state may have relinquished title in these original grants, but it did not relinquish the public's right to access, use, and enjoy the beach. *See* Ratliff, 13 Hous. L.Rev. at 994 (recognizing that until *Luttes*, the public, as well as private landowners, believed beaches to be public domain).

By implied prescription, implied dedication, or customary and continuous use, overwhelming evidence exists that Texans have been using the beach for nearly 200 years. *See Seaway Co.*, 375 S.W.2d at 936 (finding that "owners, beginning with the original ones, have thrown open the beach to public use and it has remained open"); *see also supra* note 1. This evidence establishes that public beachfront access easements have been implied across this Texas coastline since statehood. As long as a dry beach exists, so too must beachfront access easements. Any other result deprives the public of its pre-existing, dominant right to unrestricted use and enjoyment of the public beach.

## B. Texas Case Law

Texas case law not only recognizes the existence of public beachfront access easements but also that such easements "roll" with the movements of their dynamic, natural boundaries.[14] Before *Luttes*, the public assumed it had unrestricted access to use and enjoy the beach.[15] After *Luttes*, in response to public concern over its right to access Texas beaches, the Texas Legislature passed the OBA to ensure that Texas beaches remained open for public use. Challenged five years later, the Houston Court of Civil Appeals found that a public easement existed on the West Beach of

14. *See Feinman*, 717 S.W.2d at 111 (finding that rolling easement shifted after Hurricane Alicia moved the vegetation line landward causing homes to be seaward of vegetation line and subject to removal under OBA); *Matcha*, 711 S.W.2d at 98–100 (finding public easement shifts with natural movements of the beach); *Arrington v. Tex. Gen. Land Office*, 38 S.W.3d at 766 (affirming summary judgment for Land Office because once public easement is established "it is implied that the easement moves up or back to each new vegetation line"); *Arrington v. Mattox*, 767 S.W.2d at 958 (affirming that the "easement migrates and moves ... with the natural movements of the natural line of vegetation

and the line of mean low tide"); *Moody*, 593 S.W.2d at 379 (recognizing that the boundary lines shift just like navigable rivers but can "be determined at any given point of time"). *See also Mikeska v. City of Galveston*, 451 F.3d 376, 378 (5th Cir.2006) (recognizing public beach easement's "natural demarcation lines are not static" but rather "change with their physical counterparts"); *Hirtz v. Texas*, 974 F.2d 663, 664 (5th Cir.1992) (recognizing location of public beach easement "shifts as the vegetation line shifts").

15. Ratliff, *supra* note 13, at 994.

Galveston Island, forcing landowners to remove barriers and structures that prevented the public's access to and use of the public beach. *Seaway Co. v. Attorney General*, 375 S.W.2d at 940; *see also Moody v. White*, 593 S.W.2d 372, 376–79 (finding public easement over dry beach on Mustang Island and requiring removal of structure preventing public access).

In the years following the passage of the OBA, the shoreline naturally and predictably moved both gradually and suddenly. Texas courts have repeatedly held that once an easement is established, it expands or contracts ("rolls"), despite the sudden shift of the vegetation line. *See Feinman*, 717 S.W.2d at 109–10 (after Hurricane Alicia); *Arrington v. Tex. Gen. Land Office*, 38 S.W.3d at 765 (after Tropical Storm Frances); *Brannan v. State*, 365 S.W.3d 1, 7 (Tex.App.-Houston [1st Dist.] 2010, pet. filed) (after unusually high tide or "bull tide"); *Matcha*, 711 S.W.2d at 100 (after hurricane of 1983); *Arrington v. Mattox*, 767 S.W.2d at 958 (after Hurricane Alicia). In short, Texas law has adopted "the rolling easement concept." *Feinman*, 717 S.W.2d at 110–11. The Court's refusal to follow existing Texas law means that every hurricane season will bring new burdens not only on the public's ability to access Texas's beaches but on the public treasury as well.

### C. Texas Public Policy

The OBA codifies the public's pre-existing right of open access to Texas beaches:

It is declared and affirmed to be the public policy of this state that the public, individually and collectively, shall have the free and unrestricted right of ingress and egress to and from the state-owned beaches bordering on the seaward shore of the Gulf of Mexico, or if the public has acquired a right of use or easement to or over an area by prescription, dedication, or has retained a right by virtue of continuous right in the public, the public shall have the free and unrestricted right of ingress and egress to the larger area *extending from the line of mean low tide to the line of vegetation bordering on the Gulf of Mexico.*

TEX. NAT. RES.CODE § 61.011(a) (emphasis added). Migratory boundaries define rolling easements, rather than fixed points. The line of vegetation is "the extreme seaward boundary of natural vegetation which spreads *continuously* inland." TEX. NAT. RES.CODE § 61.001(5) (emphasis added). Public beach means

any beach area, whether publicly or privately owned, extending inland from the line of mean low tide to the line of vegetation bordering on the Gulf of Mexico to which the public has acquired the right of use or easement to or over the area by prescription, dedication, presumption, or has retained by virtue of continuous right in the public since time immemorial, as recognized in law and custom.

TEX. NAT. RES.CODE § 61.001(8). The OBA recognizes the dynamic nature of beach boundaries by defining the public beach by reference to the vegetation line and tide lines, which shift with the movements of the ocean, whether those movements are gradual from erosion or dramatic from storm events. Requiring that existing easements be re-established after every hurricane season defeats the purpose of the OBA: to maintain public beach access.

#### i. Disclosure of Risk Requirement

For almost twenty-five years, the state has taken the further step of informing beachfront property purchasers of the rolling nature of the easement burdening their property. Amendments to the OBA in 1985 make "pellucid that once an easement

on the dry beach is established, its landward boundary may therefore 'roll,' *including over private property." Severance v. Patterson,* 566 F.3d 490, 506 (5th Cir. 2009) (Wiener, J., dissenting) (emphasis in original); *see also* Act of May 24, 1985, 69th Leg., R.S., ch. 350, § 1, 1985 Tex. Gen. Laws 1419 (codified as TEX. NAT. RES. CODE § 61.025). Sellers of property on or near the coastline are required to include in the sales contract a "Disclosure Notice Concerning Legal and Economic Risks of Purchasing Coastal Real Property Near a Beach." TEX. NAT. RES.CODE § 61.025(a). Applicable law specifically warns that

> If you own a structure located on coastal real property near a gulf coast beach, it may come to be located on the public beach *because of coastal erosion and storm events. . . .* Owners of structures erected seaward of the vegetation line (or other applicable easement boundary) or that *become seaward of the vegetation line as a result of processes* such as shoreline erosion are subject to a lawsuit by the State of Texas to remove the structures.

*Id.* § 61.025(a) (emphasis added). The language of the Act itself clearly identifies the line of vegetation as an easement boundary and clearly recognizes the transient nature of these boundary lines. The vegetation line, "given the vagaries of nature, will always be in a state of intermittent flux[,]" and consequently, "[s]hifts in the vegetation line do not create new easements; rather they expand (or in the case of seaward shifts, reduce) the size and reach of one dynamic easement." *Severance v. Patterson,* 566 F.3d 490, 506 (5th Cir.2009) (Wiener, J., dissenting). Severance purchased her properties with contracts that notified her of these risks and nature of the rolling easement.

### ii. Constitutional Amendment Adopting the Open Beaches Act

In November 2009, Texans adopted a constitutional amendment that mirrors the policy and language of the OBA. The amendment adopts the OBA's definition of "public beach" and reiterates that the public's easement is established under Texas common law. TEX. CONST. art. I, § 33(a). It further acknowledges the permanent nature of the easement. *Id.* at § 33(b). To be consistent with the Texas Constitution, these easements must roll with the natural changes of the beach. The Court's failure to recognize the rolling nature of these easements is thus not only contrary to common law and the public policy of the state but also the will of the people expressed in our constitution.

### iii. Presumption of Public Easement Over Dry Beach

Finally, in an OBA enforcement action, there is a presumption that the public has acquired an easement over the dry beach, and a landowner like Severance may present evidence to rebut the presumption. *See* TEX. NAT. RES.CODE § 61.020. The "title of the littoral owner does not include the right to prevent the public from using the area for ingress and egress to the sea[,]" and "there is imposed on the area [from mean low tide to the line of vegetation] a common law right or easement in favor of the public for ingress and egress to the sea." *Id.* Once a public beach easement is established, it is implied that the easement moves up or back to each new vegetation line, and the state is not required to repeatedly re-establish that an easement exists up to that new vegetation line. *See Arrington v. Tex. Gen. Land Office,* 38 S.W.3d at 766.

## III. Rolling Easements Are Creatures of Texas Common Law

The answer to the second certified question is that the common law rather than the OBA is the source of public beachfront access easements. The OBA, however, is consistent with the common law of rolling easements and faithfully articulates the longstanding policy of the state. The OBA is not a rights-creating document but a mechanism for enforcing property rights that the state has previously and independently obtained. *See Arrington v. Mattox,* 767 S.W.2d at 958. Such easements are established by prescription, dedication, or customary and continuous use. Guided by the common law, "[t]he OBA safeguards the public's common law easement[,]" protecting the public's access to public beaches. *Mikeska v. City of Galveston,* 451 F.3d 376, 378 (5th Cir.2006) (citing Tex. Nat. Res.Code § 61.001(8)).

## IV. No Compensation Owed to Beachfront Property Owners Whose Property Is Encumbered by a Rolling Easement

The third certified question asks whether compensation is owed to landowners whose property becomes subject to a public beachfront access easement after it rolls with natural shifts in the shoreline. When an act of nature destroys a piece of coastal property, no compensation is owed because there is no taking by the government. Likewise, when an act of nature changes the boundaries of the beach, no compensation is owed when the government seeks to protect the already existent public right of access to the beach. The government is merely enforcing an easement whose boundaries have shifted. The

enforcement of rolling easements does not constitute a physical taking nor does it constitute a regulatory taking. Pre-existing rolling easements affect a property right that the landowner never owned, namely, excluding the public from the beach. Because no property is taken, no compensation is owed.

### A. No Physical Taking

The Texas Constitution guarantees that "[n]o person's property shall be taken, damaged, or destroyed for or applied to public use without adequate compensation being made, unless by the consent of such person." Tex. Const. art. I § 17. Texas landowners may assert an inverse condemnation claim "when the government physically appropriates or invades the property, or when it unreasonably interferes with the landowner's right to use and enjoy the property." *Westgate Ltd. v. State,* 843 S.W.2d 448, 452 (Tex.1992). By enforcing a pre-existing rolling easement, the state is not physically taking private property.

For property purchased after October 1986, landowners were expressly warned that a preexisting public easement of the dry beach restricts the landowner's right to develop, maintain, or repair structures that would prevent the public from using and accessing the public beach. *See* Tex. Nat. Res.Code § 61.025. The right to exclude the public from the dry beach was never in the landowner's bundle of sticks when she purchased the property.[16] With such express notice, the state's enforcement of the public easement cannot be said to diminish the landowner's reasonable investment-backed expectations. *See Penn.*

---

16. Severance purchased her property in 2005, and thus her land sales contract contained this express deed restriction. Severance was also put on notice before the purchase on two separate occasions. In 1999, the General Land Office released a list of homes, including Severance's, that were located seaward of the vegetation line following Tropical Storm Frances. In 2004, the property was again listed as being on the public beach but subject to a two-year moratorium order.

*Cent. Transp. Co. v. City of New York,* 438 U.S. 104, 130–31, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). The state owes no compensation for a property right that the landowner does not actually possess.

For property purchased before 1986, enforcement of a pre-existing rolling easement also does not constitute a physical taking. First, rolling easements are rooted in the common law as a single easement with dynamic boundaries. The public beach has been "historically dedicated to the public use." *Brannan,* 365 S.W.3d at 26. It is not state action that subjects beachfront property to this rolling easement but rather a *force majeure. Id.* The state merely enforces what has long been established in the common law. Almost every case addressing this issue agrees there is no taking and that the landowner should bear the risks assumed by purchasing property near the beach. "There is nothing in the [OBA] which seeks to take rights from an owner of land.... [I]t merely furnishes a means by which the members of the public may enforce such collective rights as they may have legally acquired by reason of dedication, prescription or which may have been retained by continuous right." *Seaway Co.,* 375 S.W.2d at 930; *see Arrington v. Mattox,* 767 S.W.2d at 958; *Moody,* 593 S.W.2d at 379; *Brannan,* 365 S.W.3d at 25.

## B. No Regulatory Taking

The enforcement of rolling easements does not constitute a regulatory taking. "When the owner of real property has been called upon to sacrifice all economically beneficial use in the name of the common good, that is, to leave his property economically idle, he has suffered a taking." *Lucas v. S.C. Coastal Council,* 505 U.S. 1003, 1019, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992) (establishing the total takings test).[17] But there are two exceptions. First, if the regulation restricts a use the owner does not have in his title, no taking has occurred. *Id.* at 1027, 112 S.Ct. 2886. Second, if state common law nuisance and property principles prohibit the desired use of the land, no taking has occurred. *Id.* at 1029, 112 S.Ct. 2886.

The first exception certainly applies to property purchased after 1986. As explained above, the landowner cannot receive compensation for a property right that she never owned. Beachfront property purchasers whose sales contracts contained such a deed restriction never owned the right to exclude the public from using and enjoying the dry beach.

The second exception involves the state's common law nuisance laws and other background property principles that prohibit or restrict the landowner's specific use of property. As explained above, the rolling easement is rooted in background principles of Texas common law and is supported by the OBA and the Texas Constitution. Due to natural processes, as land moves seaward of the vegetation line, that strip of land becomes subject to the pre-existing public easement established by either prescription, dedication, or continuous and customary use. This strip of land is the servient estate, encumbered by the dominant estate, the rolling easement, to reasonably fulfill its stated purpose. *Drye*

**17.** After the *Lucas* decision, which found a taking, and Hurricane Hugo, the South Carolina Legislature amended their Beach Management Act to incorporate a rolling easement on any lot that moved seaward of the setback line, specifically to avoid takings claims. The easement permits some structures but maintains the right to implement some erosion control methods. National Oceanic and Atmospheric Administration, Erosion Control Easements, http://coastalmanagement.noaa.gov/initiatives/shoreline_ppr_easements.html. (last visited Nov. 3, 2010).

v. Eagle Rock Ranch, Inc., 364 S.W.2d 196, 207 (Tex.1963). The common law has always restricted a landowner's use of the dry beach. *Arrington v. Mattox*, 767 S.W.2d at 958 (citing Texas cases that found no taking and recognizing "fundamental distinction between a governmental taking of an easement through an act of sovereignty and judicial recognition of a common law easement acquired through historical public use"); *see Lucas*, 505 U.S. at 1028–29, 112 S.Ct. 2886 (finding enforcement of existing easement not a taking).

### C. Texas Nuisance Law

Texas nuisance laws permit the enforcement of rolling easements without requiring compensation. This area of the law imposes a general limitation on landowners. Property owners may not use their property in a way that unreasonably interferes with the property rights of others. *See Schneider Nat'l Carriers, Inc. v. Bates*, 147 S.W.3d 264, 269 (Tex.2004). An action that does not begin as a nuisance may nevertheless become a nuisance due to changing circumstances. *See Atlas*

*Chem. Indus., Inc. v. Anderson*, 524 S.W.2d 681, 685–86 (Tex.1975) (finding that heavy rains causing previously discharged pollutants from upstream manufacturing plant to spread more broadly across downstream land to be a nuisance). Movements of the coast change circumstances and thus affect property rights of both private beachfront owners and the public. As a result, a beach house that moves seaward of the vegetation line because of natural changes to the coast becomes a nuisance, restricting the public's ability to use and enjoy the beach.

In this unique area of property law, rolling beachfront easements are unlike any other type of easement abutting a waterway. They are not only subject to the ebb and flow of the tide but also the ocean's surging waves. The ocean is unlike any other body of water.[18] The primary movement of the coastline is through hurricanes and tropical storms.[19] Requiring the state to re-establish public beach easements after storms places an unreasonable burden on the state, a burden that

**18.** The Court correctly declines to apply the traditional avulsion rule to the mean high tide boundary established in *Luttes*. I would also extend this to the vegetation line. The reason avulsion does not change title on rivers does not extend to coastline. Generally, avulsive events create an entirely new river bed, and "just as a stone pillar constitutes a boundary, not because it is a stone, but because of the place in which it stands, so a river is made the limit of nations [or states], not because it is running water bearing a certain geographical name, but because it is water flowing in a given channel, and within given banks, which are the real international boundary." *Nebraska v. Iowa*, 143 U.S. 359, 362, 12 S.Ct. 396, 36 L.Ed. 186 (1892). However, the running water at issue is the Gulf of Mexico, and it does not flow in a given channel *between* banks but rather constantly washes against the beaches. Here, the "stone pillar" is the Gulf of Mexico, and it stands as the boundary, not because of its specific, fixed location, but

rather because it is the Gulf. Further, avulsive events on rivers merely cuts a new river bed, separating identifiable land from its original tract. Here, when an avulsive event occurs on the beach, there is no identifiable land. Rather, the previous beach becomes entirely submerged under the Gulf, and land previously above the vegetation line is now seaward of it.

**19.** Since 1851, Galveston Island has endured more than fifty tropical storms and at least twenty-three hurricanes. The worst hurricane of the nineteenth century, however, was on October 6, 1837, leaving a two thousand mile destruction path. The Hurricane of 1900, "The Great Storm," still holds title as the deadliest natural disaster to strike the United States. It claimed the lives of at least eight thousand and left thirty thousand homeless. In 1983, Hurricane Alicia eroded fifty to two hundred feet of Galveston's coastline.

was actually assumed by the landowner who purchased property near the beach.

## V. Conclusion

The Texas coastline is constantly changing and the risks of purchasing property abutting the ocean are well known. The OBA further mandates the disclosure of these risks in coastal purchase contracts. Insurance is available for some of these risks.[20] It is unreasonable, however, to require the state and its taxpayers to shoulder the burden of these risks. In my view, coastal property is encumbered by a pre-existing rolling easement rooted in the common law. The state is not responsible for the ocean's movement and therefore owes no compensation when enforcing this existing easement. Because the Court requires the state to re-establish its easement after avulsive events and to pay landowners for risks they have voluntarily assumed, I must dissent. I would instead follow the constitution and the long-standing public policy of this state and hold that the beaches of Texas are, and forever will be, open to the public.

Justice GUZMAN, dissenting.

The boundaries of Texas's beaches are dynamic, as recognized by the laws of nature and our state's common law, statutes, and Constitution. I therefore join Justice Medina's dissent in part because I agree that (1) Texas common law establishes the concept of a migratory public beachfront access easement that moves in accordance with the ever-shifting boundaries of the dry beach, and (2) the Court's conclusion that *title* shifts due to both avulsive and accretive events, yet that any correspond-

ing *easement* allowing public use of the dry beach shifts only due to accretion but not avulsion, has no basis in logic or Texas law. Thus, the answer to the first certified question must be yes. I further agree with Justice Medina that, in answer to the second certified question, the easement traversing Carol Severance's property is derived from common-law doctrines rather than a construction of the Open Beaches Act.

However, I do not believe that a coastal landowner like Severance, whose property is burdened with an easement, is required to remove or is otherwise unable to use and maintain her home in order to accommodate the easement. The common law of this state has long envisioned a proper balancing between public and private use of the dry beach, and the law of easements does not allow an easement holder to unreasonably burden the servient estate. Thus, in answer to the third certified question, I would hold that while the public's reasonable use of a rolling easement over a private beach does not generally entitle a property owner to compensation, such an easement would unreasonably burden the servient estate if the property owner was unable to use and maintain her home. In those circumstances, the property owner would be entitled to compensation for a taking.

## I. Balance of Public and Private Interests at the Seashore

The law of this state has long recognized the need for a balance between public and private use of one of the state's most valuable resources: its seashore. *See City of*

---

20. The National Flood Insurance Program, and the Texas counterpart, the Texas Windstorm Insurance Association, helps shield beachfront property owners from the risks of a naturally changing coastline. Michael Hofrichter, *Texas's Open Beaches Act: Proposed Reforms Due to Coastal Erosion*, 4 ENVT'L & ENERGY L. & POL'Y J. 147, 151 (2009). Also, the U.S. Tax Code provides for certain casualty loss deductions for buildings damages from storms along the coast. *Id.* at 150 (citing I.R.C. § 165).

*Galveston v. Menard,* 23 Tex. 349, 393 (Tex.1859) ("This species of property, being land covered with navigable water, embraces several rights that may be separated, and enjoyed by different persons, and may become thereby, *partly private and partly public;* as, the right to the soil, a right to fish in its waters, the right to navigate the waters covering it, etc." (emphasis added)). The need to balance public and private rights to the seashore dates back even further than the days of the Republic, when the Texas coast was governed by Spanish law. *See Luttes v. State,* 159 Tex. 500, 324 S.W.2d 167, 197 (1959) (Smith, J., dissenting) ("Every man can build a house or a hut on the seashore where he can find shelter whenever he wishes; he can also build there another edifice whatsoever for his own benefit, provided the common use (of the seashore) of the people is not hampered; and he can construct galleys and any other kind of ships and dry nets there and make new ones if he desires to do so ...." (quoting Law IV, Title 28, PARTIDAS III)).[1]

A customary easement is a recognized common-law principle, *see, e.g., City of Daytona Beach v. Tona–Rama, Inc.,* 294 So.2d 73, 78 (Fla.1974); *State ex rel. Haman v. Fox,* 100 Idaho 140, 594 P.2d 1093, 1096 (1979); *State ex rel. Thornton v. Hay,* 254 Or. 584, 462 P.2d 671, 674 (1969), and contemplates a balance of private and public property rights, *see City of Daytona Beach,* 294 So.2d at 78 ("[T]he owner may make any use of his property which is consistent with such public use and not calculated to interfere with the exercise of the right of the public to enjoy the dry sand area as a recreational adjunct of the wet sand or foreshore area."); Mike Rat-

liff, Comment, *Public Access to Receding Beaches,* 13 Hous. L.Rev. 984, 991 (1975) (observing that only easements of use and passage are obtained by custom, with the fee and rights to profits of the land remaining with the land owner). Custom has deep roots in the English common law. *See* William Blackstone, 1 Commentaries *74. The high courts of several states have recognized the proper operation of customary law in the specific context of public beaches. *See City of Daytona Beach,* 294 So.2d at 78; *In re Application of Ashford,* 50 Haw. 314, 440 P.2d 76, 77 (1968); *Fox,* 594 P.2d at 1101; *Hay,* 462 P.2d at 673. This Court has also observed that public rights to the shoreline can be established by immemorial custom. *Menard,* 23 Tex. at 393.

A customary easement is tied to a locale and is not vested in a particular piece of property or defined by a particular path of use. *See City of Daytona Beach,* 294 So.2d at 78 ("This right of customary use of the dry sand area of the beaches by the public does not create any interest in the land itself."). Thus, an easement established by custom is not limited to one particular individual or the owner of a particular estate, nor is it constricted by metes and bounds. Instead, it attaches to a locale, in this case the dry beach. *See* David J. Bederman, *The Curious Resurrection of Custom: Beach Access and Judicial Takings,* 96 Colum. L.Rev. 1375, 1396 (1996); *see also* William Blackstone, 2 Commentaries *263 (observing that custom is applied to a place in general and not to any particular person).

The Court correctly observes that the Republic of Texas granted private title to West Beach property on Galveston Island

1. *See* William Gardner Winters, Jr., *The Shoreline for Spanish and Mexican Grants in Texas,* 38 Tex. L.Rev. 523, 528 n. 37 (1960) (describing Las Siete Partidas as the basic law of Spain and Mexico until the modern Civil Codes were adopted in the late nineteenth century).

in the Jones and Hall grant in 1840 without an express reservation of title or public use. *See Seaway Co. v. Att'y Gen.,* 375 S.W.2d 923, 928 (Tex.Civ.App.-Houston 1964, writ ref'd n.r.e.). And it is settled law that the land between the mean high tide line and the vegetation line constitutes the dry beach and may be privately owned. *See Luttes,* 324 S.W.2d at 191–93. But before this Court decided *Luttes,* both property owners and the public apparently assumed the public's right to freely use the dry beach, *see* Neal E. Pirkle, *Maintaining Public Access to Texas Coastal Beaches: The Past and the Future,* 46 BAYLOR L.REV. 1093, 1093 (1994), a right dating back to Spanish law, *see* LAS SIETE PARTIDAS, Third Partida, Title 28, Law IV (Samuel Parsons Scott trans., 1931) ("Every man can build a house or a hut on the sea shore which he can use whenever he wishes . . . provided the common custom of the people is not violated. . . ."); *see also Luttes,* 324 S.W.2d at 197 (Smith, J., dissenting) (observing that "[t]his definition [from the Partidas] is that the seashore is a place where every man may build a house or other building, build boats and dry nets. Very few men would want to build a house out in the water and none would want to stand in the water while building their boats, and most conclusive of all, none would attempt to dry his nets in water or even on the wet portion of the beach."). Thus, although the Court denies that the public used the beach on Galveston Island dating back to "time immemorial," there are indications of this customary use from even before the existence of the Republic.

The Court concludes that even if such customary use of the beach existed, it was cut off following the Jones and Hall grant of 1840. 370 S.W.3d 705, 728. But it is inaccurate to assume, solely based on the express terms of the Jones and Hall grant, that any right the public had to use the dry beach was completely eradicated in favor of private ownership from that point forward.

First, it is not clear that the Jones and Hall grant cut off any customary right of use the public may have had to West Beach. This Court's *Menard* decision suggests the contrary. Although *Menard* primarily concerned the wet beach on the east end of Galveston Island, its reasoning nonetheless indicates that land grants by the early Republic did not necessarily extinguish customary rights of use. *See Menard,* 23 Tex. at 394–97. There, the Court noted that under the common law, an ordinary grant of the shoreline did not generally "convey the shore or any of the land of the bay covered with water," and under civil law the seashore was generally "reserved for common use." *Id.* at 395. The *Menard* Court went on to conclude that the particular land grant in that case included the shore and water to a fixed point, but only because *Menard* and the government had specifically negotiated the unusual result. *Id.* at 397. The court considered their shared purpose of creating a city, harbor, and port of entry at Galveston, which required private ownership of "streets and lots running up to, and bordering on the channel of the bay" in order to allow the construction of wharves. *Id.* The Court observed that the sovereign has the power to convey even submerged lands, and did so in that case because it was the shared purpose of the contracting parties, but explained that such a broad grant was unusual, and that normal grants would not extend so far. *Id.* at 392. Given the historic presumption of the public's right to use the dry beach, dating back to the days before the Republic, *see* LAS SIETE PARTIDAS, Third Partida, Title 28, Law IV (Samuel Parsons Scott trans., 1931), it is hardly definitive that an ordinary grant of the nature of the Jones and

Hall grant automatically extinguished all public *use* of the shore, even when title shifted.

But even if any easement of customary use was revoked by the Jones and Hall grant, it was subsequently re-established as to West Beach in general, as demonstrated by the Houston court of appeals' *Feinman* and *Seaway* decisions which painstakingly detailed the public's use of West Beach over the past 150 years. *See Feinman v. State*, 717 S.W.2d 106, 111–13 (Tex.App.-Houston [1st Dist.] 1986, writ ref'd n.r.e.) (surveying evidence and concluding that a public easement was established on West Beach, Galveston Island by implied dedication, with evidence also supporting the trial court's finding of an easement established by prescription and custom); *Seaway*, 375 S.W.2d at 930–39 (surveying evidence and concluding that a public easement was established on West Beach, Galveston Island by prescription and implied dedication).[2] The Court here perfunctorily notes the absence of any historic custom of public use on private West Beach property. But, as mentioned, this Court has observed a public right of use

that could be acquired by immemorial custom, *see Menard*, 23 Tex. at 393, as have at least two courts of appeals, *see Matcha v. Mattox*, 711 S.W.2d 95, 98 (Tex.App.-Austin 1986, writ ref'd n.r.e.); *Moody v. White*, 593 S.W.2d 372, 379 (Tex.Civ.App.-Corpus Christi 1979, no writ). And the Court could easily take judicial notice of the detailed evidence set forth in *Seaway* and *Feinman* of widespread public use of West Beach over the past 150 years. It is therefore erroneous to conclude that a lack of evidence exists as to the public's customary use of that portion of Galveston Island.[3]

As noted, an easement established by custom is not limited to one particular individual or the owner of a particular estate, nor is it constricted by metes and bounds. Instead, it attaches to a locale, such as the dry beach of a particular area. *See* Bederman, 96 Colum. L.Rev. at 1396; *see also* William Blackstone, 2 Commentaries *263.[4] I accordingly agree with Justice Medina that the public holds a dynamic easement on the dry sand of West Beach. But the public's right of use is not abso-

---

2. Though the *Seaway* court specifically found a public easement established on West Beach by prescription and implied dedication, the detailed evidence surveyed in that opinion just as easily supports an easement established by customary use. *See Matcha v. Mattox*, 711 S.W.2d 95, 98 (Tex.App.-Austin 1986, writ ref'd n.r.e.) (describing elements of easement by customary use as public use that is ancient, peaceable, certain, obligatory, exercised without interruption, and not repugnant with other custom or law) (citing *Hay*, 462 P.2d at 677).

3. The Court does acknowledge the easement established for use of a privately owned tract seaward of Severance's property in the 1975 default judgment in the case of *John L. Hill, Attorney General v. West Beach Encroachment, et al.*, Cause No. 108,156 in the 122nd District Court, Galveston County. That easement, which extended over the dry beach as demar-

cated by the vegetation line, was established by prescription, dedication, and continuous use of the public since time immemorial.

4. The Court seems to also believe that an easement established by prescription or dedication may not shift in sync with the natural movements of the sea, a reasoning contradicted by the Court's conclusion that an easement may shift by accretion even to a previously unencumbered property. 370 S.W.3d at 723. Justice Medina ably addresses the infirmities of the Court's holding and reasoning, and so I do not replicate those arguments here. I do think it worth reiterating, however, that some portions of West Beach are eroding at a rate of seven feet a year. 370 S.W.3d at 735 (Medina, J., dissenting). It follows that, in the not-so-far-off future, the rolling easement by accretion that the Court acknowledges will inevitably move far enough to burden previously unencumbered properties.

lute. Instead, a private property owner like Severance continues to enjoy a strong property interest in her land that must be balanced with the public's use of the easement traversing her property, as reflected in rulings of this Court dating back to the 1800s, *see Luttes*, 324 S.W.2d at 191–93; *Menard*, 23 Tex. at 393, and in the law of easements.

## II. The Law of Easements

An easement is a property interest in which the easement holder may use the property of another for a particular purpose. *Marcus Cable Assocs., L.P. v. Krohn*, 90 S.W.3d 697, 700 (Tex.2002). A grant or reservation of an easement generally implies a grant of "unlimited reasonable use such as is reasonably necessary and convenient and as little burdensome as possible to the servient owner." *Coleman v. Forister*, 514 S.W.2d 899, 903 (Tex.1974). Thus, an easement does not allow an easement holder complete and total use of the servient owner's land, nor does an easement enable its holder to use it in any manner, regardless of how burdensome its use is on the servient estate. Instead, the easement holder may only use the easement as is *reasonably* necessary and in a manner that is *as little burdensome* as possible. *See id.* As the Restatement of the Law provides:

> In resolving conflicts among the parties to servitudes, the public policy favoring socially productive use of land generally leads to striking a balance that maximizes the aggregate utility of the servitude beneficiary and the servient estate. Socially productive uses of land include maintaining stable neighborhoods, conserving agricultural lands and open space, and preservation of historic sites, as well as development for residential, commercial, recreational, and industrial uses. Aggregate utility is generally produced by interpreting an easement to

strike a balance that maximizes its utility while minimizing the impact on the servient estate.

*See* RESTATEMENT (THIRD) OF THE LAW, PROPERTY (SERVITUDES) § 4. 10, cmt. b.

In order to strike the proper balance between the property owner's interest in her land and the public's interest in its easement, I believe that the public has a right to use the beach around a house on the dry beach, and that a property owner may not erect fences or other barriers that impede the public's use of the easement. But it would unreasonably burden the servient estate to disallow the property owner from using and maintaining her home. A public-use easement like that at issue here does not cede *exclusive* use of the land to the public, but instead leaves the rights of the property owner, with the exception of the right to exclude the public from access to the beach around the house. *See Coleman*, 514 S.W.2d at 903 ("No interest in real property passes by implication as incidental to a grant except what is reasonably necessary to its fair enjoyment."). If the State could claim a right to the public's absolute use of the private beach, the public's access easement would, in essence, constitute full fee simple title to the land, a result that does not comport with our decision in *Luttes* or Texas easement law. *See Coleman*, 514 S.W.2d at 903; *Luttes*, 324 S.W.2d at 191–93; *Cozby v. Armstrong*, 205 S.W.2d 403, 407 (Tex.Civ.App.-Fort Worth 1947, writ ref'd n.r.e.) ("[T]he owner of an easement does not acquire the right unnecessarily to continue it as originally used, if such use would in effect destroy the right of the owner of the fee to the enjoyment of his property."); *San Jacinto Sand Co., Inc. v. Sw. Bell Tel. Co.*, 426 S.W.2d 338, 345 (Tex.Civ.App.-Houston [1st Dist.] 1968, writ ref'd n.r.e.) ("An easement . . . gives no exclusive dominant right over the servient land unnecessary to the

enjoyment of such easement, and the dominant owner (easement owner) must make a reasonable use of the right so as not unreasonably to interfere with the property rights of the owner of the servient estate."); RESTATEMENT (THIRD) OF THE LAW, PROPERTY (SERVITUDES) § 4.10 ("[T]he [easement] holder is not entitled to cause unreasonable damage to the servient estate or interfere unreasonably with its enjoyment.").

The public can easily walk around the house in its ingress and egress to and from the water and enjoy beach recreation in the area around the house. Thus, I would conclude that the public may use the dry beach around Severance's house in order to accomplish the purpose of the easement, but that enforcing the easement so that Severance no longer has use of her home would unreasonably interfere with her rights as private property owner.

### III. Takings Law

The third certified question asks us whether a landowner would be entitled to receive compensation under Texas's law or Constitution for limitations on use of her property effected by the landward migration of a rolling easement onto her property. The Texas Constitution requires the State to compensate a person if the person's property is "taken, damaged or destroyed for or applied to public use," absent the person's consent. TEX. CONST. art. I § 17(a). "An inverse condemnation may occur if, instead of initiating proceedings to condemn property through its powers of eminent domain, the government intentionally physically appropriates or otherwise unreasonably interferes with the owner's right to use and enjoy his or her property." State v. Brownlow, 319 S.W.3d 649, 652 (Tex.2010) (citing Westgate, Ltd. v. State, 843 S.W.2d 448, 452 (Tex.1992)). Moreover, "[w]hen the owner of real prop-

erty has been called upon to sacrifice all economically beneficial uses in the name of the common good, that is, to leave his property economically idle, he has suffered a taking." Lucas v. S.C. Coastal Council, 505 U.S. 1003, 1019, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992).

Though I agree with Justice Medina that the right to exclude the public from the dry beach around Severance's property was never part of her bundle of property rights due to the pre-existing dynamic easement on the dry beach, I believe that preventing a property owner from using and maintaining her home would (1) unreasonably interfere with the owner's right to use and enjoy her property, see Brownlow, 319 S.W.3d at 652, and (2) require the property owner to sacrifice all beneficial use of her property, see Lucas, 505 U.S. at 1019, 112 S.Ct. 2886. If a property owner may not maintain and use her home, the property, in essence, loses all value to the owner. Under either theory, the property owner would be entitled to compensation because she has suffered a taking.

As Justice Medina observes, the Supreme Court enumerated two exceptions to the rule established in Lucas. No taking occurs if (1) the regulation restricts a use the owner does not have in her title, or (2) state common-law nuisance or property principles prohibit the desired use of the land. See id. at 1027, 1029, 112 S.Ct. 2886. Neither of these exceptions applies here.

First, the Open Beaches Act's mandated disclosure, given to all purchasers of property seaward of the Gulf Intracoastal Waterway after 1986, does not constitute an actual divestment from the property owner of a land use in her title. The fact that the executory contracts in these sales contain this notice of risk does not constitute a restriction in the title to the property. See Alvarado v. Bolton, 749 S.W.2d 47, 48 (Tex.1988) (noting that the terms of a deed

may vary from that of the contract, and that "the deed must be looked to alone to determine the rights of the parties" (quoting *Baker v. Baker*, 207 S.W.2d 244, 249 (Tex.Civ.App.-San Antonio 1947, writ ref'd n.r.e.))).

Second, nothing in Texas property principles prohibits a property owner from maintaining and using her home on the beach, even when the property is burdened by an easement of public use. Rather, as discussed, Texas common law mandates the necessity of balancing private and public interests in beach property, and easement law does not require the servient landowner to yield all private interest in her property to the public use of the beach. *See Brownlow*, 319 S.W.3d at 656 (observing that an unlimited easement "carries with it all rights as are reasonably necessary for enjoyment consistent with its intended use," but "the rights reasonably necessary for full enjoyment of an easement are limited").

Third, the mere presence of a house on the dry beach does not automatically constitute a public nuisance. All property is held subject to the valid exercise of the government's police powers. *City of Dallas v. Stewart*, 361 S.W.3d 562, 569 (Tex. 2012). Flowing from this, the government does not commit a taking when it abates that which is, in fact, a nuisance. *Id.* The government may-and has-used its valid police powers to impose reasonable regulations on coastal property. *See, e.g.*, TEX. NAT. RES.CODE §§ 61.011(d)(6), 61.015(g). But the Legislature has not declared the mere presence of a house on the dry beach a nuisance. And, even if it did, it is unlikely the mere presence of a house on the dry beach would constitute a nuisance in fact. *See City of Houston v. Lurie*, 148 Tex. 391, 224 S.W.2d 871, 874 (1949) (observing that "even the State may not denounce that as a nuisance which is not in fact"); *see also*

*State v. Spartan's Indus., Inc.*, 447 S.W.2d 407, 413 (Tex.1969) (describing a nuisance in fact as a condition that "endangers the public health, public safety, public welfare, or offends the public morals"). Thus, I would conclude that a private owner of dry beach suffers a taking if she is forced to remove her home or is prohibited from using and maintaining her home, even if her property is burdened by a public-use easement.

## IV. Conclusion

Because I agree with Justice Medina that a public use easement migrates with the dry beach boundaries, regardless of whether that movement is due to accretion or avulsion, and that such an easement is established under common-law principles, I join his dissent in part. However, I write separately because I also believe that a taking occurs when the government forbids a property owner from using and maintaining her home, even if the property is burdened by a public-use easement. A public-use easement to the dry beach is not a total interest in a property owner's land, and as such cannot be used to divest the property owner of all use of her property. Accordingly, I join Justice Medina's dissent in part.

Justice LEHRMANN, joined by Justice MEDINA, dissenting.

From the West Beach on Galveston Island to South Padre, the use and enjoyment of Texas public beaches by its citizens has a rich history. Today's decision casts that legacy aside, contrary to well-established easement law and supported by no coherent rationale. The Court acknowledges that littoral property owners may lose *title* to property due to changes in the shoreline, even sudden changes, as an "ordinary hazard of owning littoral property." 370 S.W.3d 705, 723. It also

recognizes that the boundaries of public easements along the shoreline are dynamic and may be changed as a result of gradual shifts in the extent of the dry beach. *Id.* at 722. Yet the Court concludes that identical changes in the dry beach resulting from sudden, avulsive events do not shift the boundaries of the public's easement. *Id.* at 725. The Court's decision threatens to "exacerbate[ ] the degradation of Texas beaches." Richard J. McLaughlin, *Rolling Easements as a Response to Sea Level Rise in Coastal Texas: Current Status of the Law After Severance v. Patterson,* 26 J. Land Use & Envtl. L. 365, 383 (2011).[1] It undermines the public interest in beach access, the ability of the State and local governments to protect coastal resources, and the private property interests of non-littoral Galveston homeowners. And the Court does so in deciding a certified question that will not be determinative of the parties' legal rights. I join Justice Medina's dissenting opinion, but write separately to emphasize a few additional points.

## I. Easement Principles

### A. An easement attached to Severance's property, and has not been abandoned

The Court devotes much of its attention to debunking the notion that an easement attached to Severance's property when the Republic of Texas granted the land to Edward Hall and Levi Jones in 1840. The Court reasons that no easement attached to the land at that time because the grant contained no express reservation of rights, and the Texas Legislature later disclaimed any title to the property. But regardless of the omission of language expressly reserving an easement or the Legislature's treat-

ment of the entirely separate issue of title, a public easement on Galveston's West Beach by prescription, custom, or use under the common law has been recognized in several cases, based in part on historical records of public enjoyment of the beach extending back to years before the land grant. *See, e.g., Matcha v. Mattox,* 711 S.W.2d 95, 99 (Tex.App.-Austin 1986, writ ref'd n.r.e.) (noting that since at least 1836 the public has consistently used the beach for travel); *Feinman v. State,* 717 S.W.2d 106, 111–13 (Tex.App.-Houston [1st Dist.] 1986, writ ref'd n.r.e.). The public's use of the beach has continued to this day, and it is a fundamental tenet of easement law that there must be clear evidence of intent before an easement will be found to have been abandoned. *See Dallas Cnty. v. Miller,* 140 Tex. 242, 166 S.W.2d 922, 924 (1942) (abandonment of an easement requires a "definite act showing an intention to abandon and terminate the right possessed by the easement owner"). There is no such clear indication of abandonment in this case.

More importantly, the lack of any expressly reserved easement may be inconsequential once the record in the federal court is fully developed: according to the district court, Severance admitted that her property was subject to an easement. *Severance v. Patterson,* 485 F.Supp.2d 793, 803 (S.D.Tex.2007). The Court's extended historical discussion thus serves no purpose. Instead, it merely obscures the Court's error in departing from longstanding case law in resolving the real issue: whether the public's easement on the dry beach rolls.

### B. Easements can roll

The Court's decision appears to be predicated upon the assumption that an ease-

---

1. Professor McLaughlin has submitted an amicus brief reiterating many of the points his article articulates.

ment's boundaries must be fixed to a specific metes and bounds location. If this were the case, an oceanfront easement could never be proven.[2] Littoral boundary markers continually shift, although often imperceptibly, due to wind, waves, and weather. A beachfront easement cannot be fixed in place any more than the migratory seashore itself can be frozen. *See Matcha*, 711 S.W.2d at 100. In doing so, the Court renders the Open Beach Act's invitation to prove the existence of an easement "by prescription, dedication, [or] ... continuous right in the public" meaningless.

No case law compels the Court's decision; to the contrary, every Texas appellate court that has considered the issue has concluded that the public's easement on the dry beach rolls, even if they have not used the term "rolling easement." *Arrington v. Tex. Gen. Land Office*, 38 S.W.3d 764, 766 (Tex.App.-Houston [14th Dist.] 2001, no pet.); *Feinman*, 717 S.W.2d at 108–11; *Matcha*, 711 S.W.2d at 98–100; *see also Mikeska v. City of Galveston*, 451 F.3d 376, 378 (5th Cir.2006) ("To prevent destruction of the public beach from a landward shift of the mean low tide line, the legal boundaries of the public easement change with their physical counterparts.").

The idea that an easement's boundaries may not be fixed at a specific metes and bounds location, particularly an easement dictated by the contours of a body of water, is not novel. For example, the United States exercises a navigable servitude over the nation's navigable waters that extends to the waterway and its bed below the ordinary high-water mark. *United States v. Rands*, 389 U.S. 121, 123, 88 S.Ct. 265, 19 L.Ed.2d 329 (1967) (citing *Fed. Power Comm'n v. Niagara Mohawk Power Corp.*,

347 U.S. 239, 249, 74 S.Ct. 487, 98 L.Ed. 666 (1954)). In real terms, the navigable servitude gives the federal government the power to change the course of a navigable stream or utilize the stream of water for power generation without compensating riparian owners for diminution in the market value of their lands. *Id.* The servitude's boundary is natural and dynamic, responding to the ever-changing course of a navigable waterway. *Philadelphia Co. v. Stimson*, 223 U.S. 605, 634–35, 32 S.Ct. 340, 56 L.Ed. 570 (1912). The United States Supreme Court has long recognized that the easement moves in response to changes in the bed and banks of the stream. "The public right of navigation follows the stream and the authority of Congress goes with it." *Id.* (citations omitted).

Moreover, this Court's decision is contrary to other fundamental precepts of the law governing easements. In construing an easement, including its geographic extent, the easement's purpose is paramount. *See Marcus Cable Assocs., L.P. v. Krohn*, 90 S.W.3d 697, 701 (Tex.2002); Restatement (Third) of Prop.: Servitudes §§ 4.1, 4.8 (2000). Here, the easement provided the public with access to the Gulf and the associated recreational opportunities. The specific metes and bounds location of the easement is unimportant to that purpose; instead, proximity to the Gulf is the critical determinant of its utility and thus its location. *Cf.* Joseph L. Sax, *The Accretion/Avulsion Puzzle: Its Past Revealed, Its Future Proposed*, 23 Tul. Envtl. L.J. 305, 353–54 (2010) (noting that "maintaining water adjacency for riparian/littoral landowners and assuring public use of overlying water (and some part of the foreshore) are the central goals of the law relating to migratory waters, and title

---

**2.** The Court recognizes as much in holding that changes in the vegetation line resulting

from erosion or accretion do not require proof of a new easement.

should therefore follow a moving water boundary without regard to the rate, perceptibility, or suddenness of the movement"). We have acknowledged that the common law allows some flexibility in determining an easement holder's rights, although an easement's purposes may not be expanded. *Marcus Cable*, 90 S.W.3d at 701; *see also* JON W. BRUCE & JAMES W. ELY, JR., THE LAW OF EASEMENTS AND LICENSES IN LAND § 7:3 (2009) (noting that the nature of certain easements for recreational purposes means that they "cannot be located with precision [and] often entitle the holder to use the entire servient estate"). Furthermore, easements should be interpreted to preserve their utility over time. *See Mikeska*, 451 F.3d at 378; *Arrington*, 38 S.W.3d at 765 (holding that the public beach access easement shifted with the vegetation line affected by Tropical Storm Frances); *Bess v. Cnty. of Humboldt*, 3 Cal.App.4th 1544, 5 Cal.Rptr.2d 399, 403 (1992) (recognizing continued public access easement to gain entry to river despite shifts in river bed); *Bruce v. Garges*, 259 Ga. 268, 379 S.E.2d 783, 785 (1989) (concluding that rights of holders of recreational use and access easements to beach area expanded as rights of holder of underlying fee expanded with accreted land). In holding that the storms that routinely alter the Gulf shoreline can eliminate the public's easement on the dry beach, the Court violates these fundamental principles.

## C. No legal support exists for the distinction between gradual and sudden movement

While Texas appellate courts have applied the avulsion/accretion distinction to changes in riparian boundaries, no appellate court in Texas has heretofore applied that distinction to littoral easements. That no court has applied the avulsion doctrine to littoral property is not surprising; the doctrine is simply incompatible with the types of changes that Gulf storms cause on Texas beaches. In an avulsive event, "a solid and compact mass ... a solid body of earth" is moved by floodwaters and "instantaneous[ly] and visibl[y] creat[es]" a new bank. *Nebraska v. Iowa*, 143 U.S. 359, 369, 12 S.Ct. 396, 36 L.Ed. 186 (1892). In contrast, the landward movement of a littoral vegetation line occurs, not as the result of the movement of a discernable chunk of land, but instead as the result of "waves reaching above the normal wet line on the beach and eroding the vegetated sand, burying vegetation with eroded sand, or both." McLaughlin, *supra*, at 382.

The rule announced by the Court—that the public easement may shift if the shoreline boundaries move slowly, but not if the change occurs suddenly—is supported solely by the Court's conclusion that it would not be "reasonable ... to hold that a public easement can suddenly encumber an entirely new portion of a landowner's property or a different landowner's property that was not previously subject to that right of use." 370 S.W.3d at 723. To the extent that "reasonableness" is an appropriate factor to consider in determining where an easement lies, the Court should look to the impact on the easement holder as well as the burden on the owner of the servient estate. Severance, like all purchasers of beachfront property, took the property knowing that it could eventually become submerged.[3] She was expressly

---

3. Express warnings aside, a purchaser of beachfront property "should be aware[ ] of the risks involved. The beach is a constantly changing, dynamic phenomenon. While its enchantment demands the highest prices, its instability carries with it the greatest risks. Purchase of beachfront realty is little more than a calculated gamble." Mike Ratliff,

warned that the property she was purchasing "may come to be located on the public beach because of coastal erosion and storm events," *see* TEX. NAT. RES.CODE § 61.025, and, in fact, the property was already on a list of island properties that were wholly or partially within the public easement published by the Land Commissioner. The Court's decision provides Severance with a windfall she clearly did not bargain for—an encumbrance-free parcel of seafront property. The burden on a property owner in Severance's position pales in comparison to the burden the Court imposes on the public by requiring the State to pay for a new easement when vegetation lines inevitably shift due to hurricanes and tropical storms. As one author has noted, the balance struck by the Court's "approach fails to consider the nature and purpose of the public right of access, which is unique to the coast." McLaughlin, *supra*, at 386.

## II. Practical Implications of the Court's Decision

### A. The Court's ill-founded decision will contribute to the degradation of Texas's beaches, ultimately to the detriment of littoral property owners

The Court's decision rests on its application of a distinction that has been described as a "baffling riddle[ ]" in general, Sax, *supra*, at 306, and "unwarranted" as applied in this case. McLaughlin, *supra*, at 386. The Court's application of the avulsion/erosion distinction in its original opinion.in this case has been roundly criticized. According to Professor Richard McLaughlin of the Harte Research Institute for Gulf of Mexico Studies at Texas A

& M University–Corpus Christi, the Court's

approach ... does not accurately reflect geologic reality along the Texas coast. No coastline can be viewed through the "snapshot" of a limited span of time. Coastal erosion is episodic, not either "imperceptible" or "avulsive" as indicated in the court's majority opinion.

. . .

The ongoing nature of erosion [on Texas's Gulf beaches] causes a narrower beach and a situation where a relatively small storm event may cut back the vegetation line. Any significant landward movement of the vegetation line is normally rare, but is often indistinguishable from an event that may be termed avulsive, except in degree.

*Id.* at 382–83.

The Court's decision is likely to "exacerbate[ ] the degradation of Texas beaches." *Id.* at 383. Under the Court's decision, the State's ability to enforce the Open Beaches Act's restrictions on the placement of structures on the dry beach will be severely hampered, if not eliminated. See TEX. NAT. RES.CODE §§ 61.013, 61.018. The placement of structures on newly exposed dry beach will discourage the growth of vegetation that would normally "captur[e] windblown sand and establish[ ] stable dunes that help protect landward areas from storm impacts and slow the rate of shoreline retreat." McLaughlin, *supra*, at 382.

Furthermore, several provisions of the Texas Constitution restrict or prohibit the expenditure of public funds for private purposes. *See, e.g.,* TEX. CONST. art. III, §§ 50–52. Several amici have argued that the Court's decision will prevent the State

Comment, *Public Access to Receding Beaches,* 13 HOUS. L.REV. 984, 1013 (1976) (footnote omitted).

and local governments from funding vital beach renourishment programs since they will benefit beaches from which the public is excluded.[4] The Court's decision thus threatens to accelerate the degradation of Texas's Gulf beaches. McLaughlin, *supra*, at 386. As a result, littoral property owners like Severance may find that, though their property is no longer burdened by a public easement when the vegetation line shifts landward, they face the impending loss of their title as the mean high tide line also shifts landward.

## B. The Court's decision disserves the interests of owners of nonlittoral Galveston property

Finally, the Court's decision is almost surely detrimental to the interests of non-littoral Galveston property owners. As one author observed more than thirty-five years ago, "What good would it do to buy real estate near the beach, if you lack access to it? 'You might as well buy land in Midland, as buy halfway behind the beach front if you can't get to the beach anyway.'" Ratliff, *supra* note 3, at 1014 (quoting Eckhardt, *The National Open Beaches Bill,* in TEXAS LAW INSTITUTE OF COASTAL AND MARINE RESOURCES CONFERENCE ON THE BEACHES: PUBLIC RIGHTS AND PRIVATE USE 41 (1972)). More than five million tourists visit Galveston Island each year, and many of them rent vacation properties on Galveston. *See* Brief of Amicus Curiae Galveston Chamber of Commerce at 12. Gulf-front properties, of course, attract the highest rent. *See, e.g.,* Galveston West End Rentals, http://www. galvestonwestendrentals.com (last visited Mar. 16, 2012). But other properties, more distant from the beach, rely on pub-

lic access to the beach as an enticement to potential renters. For example, one second row property advertises, "Whether you're enjoying the gulf breeze or *taking a walk along the nearby beach,* this home is perfect for a family get-a-way." Galveston West End Rentals, http://www.galveston westendrentals.com/sealegacy.htm (last visited Mar. 16, 2012) (emphasis added). It seems likely that the Court's decision restricting beach access will decrease the rental value of non-beachfront properties and thus their property value. Further, nonlittoral property owners in the Sea Isle subdivision in which Severance's former property lies likely believed that their purchase included an interest in the dry beach as common property.

## III. The Court Should Decline to Answer the Certified Question

Finally, in light of recent developments, the Court should decline to answer the certified question. After this Court granted the public officials' motion for rehearing, Severance took advantage of a Federal Emergency Management Agency hazard mitigation grant program and sold her Kennedy Drive home to the City of Galveston. The Fifth Circuit determined that the sale did not moot the controversy because Severance might still be liable for penalties for past violations of the Open Beaches Act. The Fifth Circuit's short memorandum order did not offer any statutory analysis underlying its conclusion, but I believe it is founded on a misreading of the Act's penalty provisions. And even if the case is not moot in a technical sense, the Court's opinion decides a question of

---

4. In the wake of the Court's initial opinion, the General Land Office cancelled a $40 million beach renourishment program after concluding that the vegetation line had shifted after Hurricane Ike. Harvey Rice, *Appeals*

*Court Upholds Beach Act Challenge,* HOUSTON CHRONICLE, Sept. 28, 2011, http://www.chron. com/news/houston-texas/article/Appeals-court-upholds-beachact-challenge-2193558.php.

law that is determinative of no live controversy. Under these circumstances, the Court should exercise the discretion our rules afford it and decline to answer the certified question.

In 1985, Texas voters approved an amendment to the Constitution to allow both this Court and the Court of Criminal Appeals to answer certified questions. TEX. CONST. art. V, § 3–c(added Nov. 9, 1985). The amendment also authorized this Court to promulgate rules governing acceptance of certified questions. Tex. Const. art. V, § 3–c. Texas Rule of Appellate Procedure 58.1 provides that the Court may accept and answer certified questions if the certifying court is presented with "determinative questions of Texas law having no controlling Supreme Court precedent." TEX.R.APP. P. 58.1. The rule expressly provides that the Court may decline to answer questions certified to it. *Id.* In my view, because the Court's decision will not be determinative of any pending controversy, the Court should decline to answer the certified question.

First, even assuming that an as-yet-unfiled penalty action could make the Court's answer determinative of the parties' rights, I do not believe that Severance is subject to penalties under the Open Beaches Act. The Act allows State officials and local prosecutors to recover statutory penalties in a judicial proceeding. TEX. NAT. RES.CODE § 61.018(b). However, the statute provides for recovery of those penalties only in conjunction with an action to obtain an injunction to remove or prevent the construction of structures on the beach. *Id.* § 61.018(a). Since Severance no longer owns the property, she would not be a proper party in such a suit. The Act also provides for the imposition of administrative penalties. *Id.* § 61.0184. But the administrative penalties provision applies to parties who presently own or are building or maintaining a structure on the public beach. *Id.* (requiring the Land Office Commissioner to give notice and an opportunity for a hearing to "a person who is constructing, maintains, controls, owns, or possesses the structure, improvement, obstruction, barrier, or hazard on the public beach"). Since Severance no longer owns the Kennedy Drive property, she no longer maintains or possesses it. It seems clear that she would not be subject to administrative penalties under the statute.

The Court should exercise the discretion afforded it by Rule 58.1 and decline the certified question. Though this Court has not defined "determinative" in the context of certified questions, the commonly understood meaning of the word should apply. *See Gilbert v. El Paso Cnty. Hosp. Dist.*, 38 S.W.3d 85, 89 (Tex.2001) (citing *Fitzgerald v. Advanced Spine Fixation Sys., Inc.*, 996 S.W.2d 864, 865 (Tex.1999)) (noting that in cases involving statutory interpretation, where a term is undefined we apply its common accepted meaning). Therefore, under the common meaning of determinative, the Court should only answer questions that will "fix, settle, or define" the outcome of federal litigation. Determinative Definition, MERRIAM-WEBSTER ONLINE, http://www.merriam-webster. com/dictionary/determinative (last visited Mar. 16, 2012); *see also* TEX.R.APP. P. 58.1. The Fifth Circuit characterized Severance's claims as an assertion that, "as applied to her properties, the migration of the rolling easement without a finding of prescription, dedication or custom, and without compensation, effects an unconstitutional taking and seizure." *Severance v. Patterson*, 566 F.3d 490, 494–95 (5th Cir. 2009), *certified questions accepted*, 52 Tex. Sup.Ct.J. 741 (May 15, 2009). As to the takings claims, the Fifth Circuit held that Severance's federal claims were not ripe because "[a Texas court] might award relief under the facts Severance has alleged"

under state law. *Id.* at 500 (citing *Rolf v. City of San Antonio,* 77 F.3d 823, 827 (5th Cir.1996) (holding that two of plaintiff's claims were unripe where Supreme Court of Texas had expressly declined to address those exact claims)). As to the seizure claims, it held that the ripeness of Severance's seizure claims could not yet be determined because "[w]hether a 'reasonable' seizure has been accomplished by the Officials here depends on a definitive construction of Texas law." *Id.* at 503. Accordingly, the certified questions only encompass Severance's seizure claim as it relates to the Kennedy Drive property. The fact that Severance no longer owns the Kennedy Drive property means that the Court's opinion no longer answers questions that are determinative to the outcome of Severance's seizure claim. Because any opinion this Court delivers would not be determinative of the parties' rights in the lawsuit as it is currently framed, the Court should decline to answer the certified questions and withdraw its original opinion.

### IV. Conclusion

The Court's original opinion, which differs little from the replacement issued today, has drawn a storm of criticism from academics and a torrent of amicus curiae briefs from governmental entities and ordinary citizens imploring the Court to preserve the public's cherished right to access the seashore. In deciding whether, under the common law, a littoral easement can roll when natural processes shift an easement's boundary markers, the Court takes a course that diverges from the relevant precedents: Texas courts have long recognized the migratory nature of the public's easement on the dry beach and the Court's application of the avulsion/accretion distinction to seashores is equally unsupported. At a minimum, the Court should decline to answer any question that is certified to it, since its answer will not resolve any live controversy. I respectfully dissent.